205 So.2d 422

### E. F. MINYARD

v.

### CURTIS PRODUCTS, INC.

No. 48515.

Dec. 11, 1967.

Rehearing Denied Jan. 15, 1968.

Graham & Graham, Louis B. Graham, New Orleans, for plaintiff-appellant.

Bernard, Micholet & Cassisa, Paul V. Cassisa, New Orleans, for defendant-appellee, respondent.

SUMMERS, Justice.

This action was initiated when E. F. Minyard d/b/a Rockwood Insulation Company (Minyard) filed a "Petition for Indemnity" against Curtis Products, Inc., (Curtis) on November 17, 1965. Curtis filed peremptory exceptions based upon pleas of prescription of one year for actions in redhibition under Civil Code Articles 2534 and 2546 and of ten years for personal actions under Article 3544. The trial court and the Court of Appeal have sustained Curtis' peremptory exceptions and have dismissed Minyard's suit. See Minyard v. Curtis Products, Inc., 192 So.2d 208 (La. App.1966). Writs were granted to review this action. 250 La. 104, 194 So.2d 99 (1967).

The sole issue presented for this Court's consideration is whether or not appellant's cause of action as set forth in the "Petition for Indemnity" has prescribed under Articles 2534 and 2546 or 3544 of the Civil Code.

On March 3, 1953 the Housing Authority of New Orleans (HANO), as owner, entered into a construction contract with Pittman Construction Company (Pittman) for the construction of Section 1 of the Desire Street Housing Project (Project). For the purposes of this construction, Pittman entered into a subcontract with Minyard whereby the latter became bound for the application of caulking materials under Pittman's general contract with HANO. Minyard was to receive $3,000 for the work and for furnishing the materials. The subcontract restated those portions of the general contract which were pertinent to the required application of caulking materials; it read in part as follows:

"Caulking compound shall be Kuhl's Plastoid, Pecora, or equal. Compound shall be of proper consistency to be readily worked and not be affected by vibrations or long exposure to outside climate or temperature changes. Compound shall form a thin tough elastic film on surface but remain permanently plastic underneath * * *."

In an effort to comply with the requirements of his subcontract, Minyard decided

upon a "regular Plastoid" caulking compound, which is not the name of a specific material, but, instead, is a generic term and the trade name of several grades of caulking compound manufactured by Plastic Products, Inc., and distributed by a subsidiary corporation Plastoid Products Company, Inc.

As required by the contract, Minyard submitted to HANO's architects a sample of the "regular Plastoid" caulking compound, together with a chemical and physical analysis of the compound which had been submitted to Minyard by Plastoid Products, Inc., from whom Minyard was buying the caulking compound. The analysis and representations concerning the compound submitted by Plastoid Products, Inc., had in turn been prepared by Plastic Products, Inc., the manufacturer from whom Plastoid Products, Inc., was to purchase the material for resale to Minyard.

In its transmittal of the analysis and representations concerning the compound to Pittman, Minyard endorsed the properties of the compound and guaranteed it would comply with the specifications.

The sample submitted by Minyard was approved by HANO's architects and Minyard commenced the caulking work. Shortly thereafter HANO's clerk-of-the-works noted that the caulking was beginning to pull away from the aluminum. This fact was brought to Minyard's attention, and

it was suggested to Minyard that there be an inspection of the work by representatives of the caulking compound manufacturer. The manufacturer did inspect the work and stated that the "pulling away" was not due to any defect in the caulking compound material. A supervising architect was called in, and he decided that the caulking was "not too objectionable provided it didn't develop into anything worse."

Minyard proceeded with the caulking job. Then on January 26, 1955 the clerk-of-the-works complained in writing to Pittman that "the caulking used is pulling away from wood, brick, aluminum and iron and does not appear to be elastic underneath" and that it was not in compliance with the specifications.

Thereafter, at HANO's request, a test was run on a sample of the compound by the Pittsburg Testing Laboratory. The test revealed that the shrinkage of the compound was 23.55% rather than the 8.9% which had been certified by the manufacturer and endorsed and guaranteed by Minyard. Pittsburg Testing Laboratory also tested a sample of the caulking which had been applied on the houses by Minyard and found it to be hard on the surface but nonplastic underneath. It was also found that the caulking which Minyard had applied showed cracks ranging from hairline to ⅟₁₆ inch.

HANO, in compliance with the provisions of the general construction contract,

caused the removal of the "regular Plastoid" caulking compound and had it replaced with a suitable material. The cost incurred by HANO in correcting this defective condition amounted to $16,994.42.

On November 15, 1955, Pittman, the general contractor, filed suit against HANO, as owner, for materials furnished and work performed by Pittman in constructing the Project. HANO filed a reconventional demand against Pittman for the costs it had incurred in remedying the defective caulking job. Pittman, in a third party proceeding, prayed for judgment over against Minyard, its subcontractor, for the amount Pittman might be held to pay to HANO under the reconventional demand.

After trial the District Court held Pittman liable to HANO for $16,994.42 as HANO's cost for correcting the caulking work and gave judgment in favor of Pittman for this amount over against Minyard, the caulking subcontractor. The judgment was affirmed by the Court of Appeal (Pittman Const. Co. v. Housing Authority of New Orleans, 169 So.2d 122), and writs were refused in this Court, 247 La. 344, 170 So.2d 865 (1965).

Both courts found that the "pulling away" and cracking were due solely to the fact that the "regular Plastoid" caulking compound had failed to meet the requirements of the specifications. There was no question of improper workmanship on the part

of Minyard, the subcontractor. Minyard's liability was predicated upon his endorsement and guarantee of the physical and chemical analysis and properties of the caulking compound.

Minyard satisfied the judgment against him by paying Pittman $24,100 on March 29, 1965. Minyard filed this present suit approximately eight months later on November 17, 1965 against Curtis the successor of Plastic Products, Inc., manufacturer of the caulking compound, for "Indemnity" claiming the amount it, Minyard, had paid to Pittman, the costs and expense incurred in that suit, attorneys fees and the sum of $20,000 for loss of reputation and business due to the suit in which Minyard had been involved with Pittman and the Housing Authority. Minyard styled this claim "Petition for Indemnity". It seems also to be cumulated with a claim against Curtis Products, Inc., as the successor of Plastoid Products, Inc.

It was to this petition that Curtis Products, Inc., the successor of the manufacturer, interposed the pleas of prescription of one and ten years based upon the theory that Minyard's claim, although labeled a petition for indemnity, was in fact a suit for redhibition prescribed in one year under Articles 2534 and 2546 of the Civil Code. Alternatively, it is asserted that it is a suit for breach of contract and, as such, is a personal action prescribed in ten years under Article 3544 of the Civil Code.

The trial court found the prescription of one year under Articles 2534 and 2546 of the Civil Code applicable for it considered this to be a suit in redhibition between the buyer, Minyard, and the seller, Curtis as the successor of Plastoid Products, Inc., for which a remedy was provided by law which was prescribed in one year from the sale (La.Civ.Code art. 2534), or at the latest within one year from the discovery of the vice in the thing sold. (La.Civ.Code art. 2546). January 26, 1955 was found to be the date when the vice in the caulking compound was "discovered" for it was on this date, it will be recalled, that the clerk-of-the-work called attention to the "pulling away" of the caulking compound.

On appeal to the Fourth Circuit the judgment was affirmed. The Court of Appeal announced, moreover, that because the suit was instituted on November 17, 1965, more than ten years after the cause of action accrued on January 26, 1955, recovery is barred by the prescription of ten years provided for in Article 3544 of the Civil Code.

■ We are of the opinion that a basic error occurred in both the trial court and the Court of Appeal brought about, perhaps, by the deceptive similarity in the names of Plastoid Products, Inc., and Plastic Products, Inc., two business corporations. Although one may have been the distributor of the products of the other, as Plastoid Products, Inc., was indeed the distributor of the products and of the caulking compound manufactured by Plastic Products, Inc., they must, nevertheless, in legal contemplation, be considered as separate entities, Plastoid Products, Inc., being the seller of the compound to Minyard and Plastic Products being the manufacturer of the compound. Plastic Products, Inc., the manufacturer, had no express contractual relation with Minyard the buyer.

■ The confusion occasioned by the similarity in the names of these two corporations is further compounded by the fact that Curtis is the successor to both Plastoid Products, Inc., and Plastic Products, Inc. A suit against Curtis, the successor of Plastoid Products, Inc., the seller, by Minyard, the buyer, would therefore be subject to the pleas of prescription applicable to actions in redhibition advanced by Curtis; but those prescriptive pleas would not necessarily bar a suit by Minyard for indemnity against Curtis, the successor of Plastic Products, Inc., the manufacturer with whom Minyard had no contractual relationship.

■ It is obvious from the above facts that the judgment against Pittman for the cost of replacing the faulty caulking compound was not brought about through any fault on the part of Minyard. Both the trial court and the Court of Appeal so found. Minyard's responsibility to Pittman

was purely technical, vicarious or derivative because it endorsed the physical and chemical analysis and representation of the manufacturer in whose stead Curtis stands in this suit. The real fault or cause of the expense or damage incurred in the re-caulking work on the project was the defective material of the manufacturer, the predecessor of Curtis. There was no contract between Minyard and Curtis as the successor of the manufacturer. Minyard's contract was with the seller. Thus, Minyard seeks indemnity against the manufacturer, not the seller, and since there was no buyer-seller relationship the prescription applicable to suits in redhibition or for suit on an express contract are not applicable.

Even though Minyard has been compelled to pay the amount it paid in satisfaction of the judgment against it because of its technical or constructive liability, when the real fault or cause of damage to Pittman was the manufacturer's defective caulking compound, the law provides no express statutory remedy for Minyard in this situation.

The courts have, however, since early times, sought to grant relief in such a situation. These cases have not been definitive in their treatment of the theoretical basis for a recovery.

The device employed by the courts to grant relief has sometimes been the civil law action de in rem verso, which is an action for unjust enrichment. (Garland v. Scott's Estate, 15 La.Ann. 143 (1860); Payne & Harrison v. Scott, 14 La.Ann. 760 (1859). More often, however, the courts have employed the action in indemnity. As early as 1814 the principle emerged in a decision of this court (Meunier v. Duperron, 3 Mart., O.S., 285) that if one not actually at fault, i. e., one who was in good faith, is made to answer for the injury sustained by another, then the party not actually at fault has a cause of action to recover against the party whose fault caused the injury. Cf. Fitzgerald v. Ferguson, 11 La.Ann. 396 (1856).

In Brannan, Patterson & Holliday v. Hoel, 15 La.Ann. 308 (1860) the Court determined that Brannan, Patterson & Holliday, who paid the damage caused by a collision in which their steamboat was involved, were entitled to reimbursement from one Hoel, who was piloting the steamboat and whose negligence caused the damage. This result was obtained without stating the legal principles upon which the reimbursement was allowed. Note, 7 La.L. Rev. 592 (1947). In the case of Sincer v. Heirs of Bell, 47 La.Ann. 1548, 18 So. 755 (1895), the principle that the party not at fault who has paid the damage can recover from the person actually at fault is restated by inference when the Court disallows Sincer's recovery against Bell finding that

Bell was not at fault in causing the injury to the third parties.

After the Brannan v. Hoel Case, supra, the courts considered a number of cases for indemnity arising out of tort. Indemnity was allowed in Costa v. Yochim, 104 La. 170, 28 So. 992 (1900) where an employer has been compelled by judgment to pay the injured person and then sued the negligent employee, and in Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922), where the plaintiff owner recovered from the occupier of premises after paying a judgment of the injured third party. See 7 La.L.Rev. 592 (1947).

The case of Sutton v. Champagne, 141 La. 469, 75 So. 209 (1917), while not adding to our understanding of the basis upon which indemnity is allowed by the courts, does give us a better general understanding of its nature. The facts upon which the decision rests are stated in the opinion:

"This suit is against the parents of two 14 year old boys, Charles Champagne and Leo Sill, in damages for the death of a colored boy, the little 9 year old son of the plaintiffs, who was killed in one of the streets of the city of New Orleans, in the built-up part of the city, by a bullet out of a 22-caliber Remington rifle * * * with which the two boys and four other boys of about the same age had just been shooting birds in the street.

\* \* \* \* \* \*

"The rifle and the cartridges had been given to young Champagne by his father, and on the occasion in question young Champagne was shooting birds with it in a large tree in the street; the other boys being with him. Leo Sill begged to have the gun to shoot, and Champagne let him have it; and just then the gun went off, as Leo Sill was trying to ascertain whether it was cocked."

Discussing the liability of the parent of young Sill and the question of whether she might seek reimbursement from Champagne's father, the Court said:

"We meet with * * * difficulty in solving the legal problem as to the liability vel non of the mother of young Sill. It seems illogical and hard that a mother should be liable in damages for the consequences of the act of somebody else in intrusting a dangerous instrument to her inexperienced child out of her presence and without her knowledge. At the same time the plaintiffs make out a case against her, under the hereinabove quoted codal provisions (La.Civ.Code arts. 2316, 2317, 2318), when they show that, owing to the unskillful and careless handling of a rifle in the street by her boy, their child was killed. The solution of the problem must be that, while she is liable to the plaintiff, she has her recourse over

against the person who by his act brought the responsibility upon her; and we shall so decide."

The case of South Arkansas Lumber Co. v. Tremont Lumber Co., 146 La. 61, 83 So. 378 (1919) decided the important question that the claim of a party entitled to indemnity does not commence to run until he has been condemned by judgment of court to pay the damage out of which his cause of action arises.

Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922), announced the concept of indemnity with some clarity and allowed recovery under that theory, but it wrongfully formulated the basis of recovery when it announced that the claimant of compensation, Appalachian, had a cause of action in tort for contribution from a joint tort-feasor.[1]

Subsequent decisions which followed the Appalachian rule reasoned that the exception to the general rule, prohibiting contribution between joint tort-feasors not cast

in solido, operates a *legal subrogation,* the effect of which is to allow the "joint tort-feasor" who is only technically or constructively liable to assert the injured third parties' claim against the party actually at fault. Johnson v. Housing Authority of New Orleans, 163 So.2d 569 (La.App.1964).

Although the Appalachian Case properly permitted recovery, the "joint tort-feasor" not really at fault who paid the claim of the injured party was given a right to seek "contribution" for the full amount which he paid. The use of this concept has frequently been questioned. This injury was caused, not by any act of negligence on the part of Appalachian but because of the "actual fault" of Brooklyn Cooperage Co. Appalachian's liability to Lincoln, its employee, is a liability imposed because of the employer-employee contractual relationship and by its obligation to furnish him a safe place to work. Appalachian, then, is only "technically or constructively at fault", while Brooklyn Cooperage Co. is "actually at fault". Brooklyn Cooperage

---

1. American Employers' Ins. Co. v. Gulf States Utilities Co., 4 So.2d 628, 630, 631 (La.App.1941).

" * * * the Louisiana Courts have recognized the right of one tort-feasor to indemnity from another when the claimant is guilty of no fault and has been subjected to liability only because of some arbitrary rule of law * * * the claimant of indemnity must show that he discharged an existent obligation which, as between him and defendants, should in good conscience have been shouldered by the latter." Note, 7 La. L.Rev. 255 (1947).

*"Joint Tortfeasors—Right to Indemnity*
"The Louisiana courts have consistently recognized that a tort-feasor who is obliged to satisfy a judgment against him may seek indemnity from a third party who, as between himself and the indemnity claimant, was primarily responsible for the injury to the victim." Malone, "Torts and Workmen's Compensation". 17 La.L.Rev. 345, 348–349 (1956). See also, Note, 9 Tul.L.Rev. 125 (1934–1937); 4 La.L.Rev. 451 (1941 & 42); Holloman, "Contribution Between Tort-Feasors: Treatment By the Courts of Louisiana", 19 Tul.L.Rev. 255 (1944).

alone has caused an injury or damage, under Article 2315 of the Civil Code, which Appalachian is under a "legal duty" to repair.

■ Contribution was the incorrect concept to employ, in this context; first, because a joint tort-feasor cannot seek contribution unless the tort-feasor against whom he seeks contribution has been cast in solido with him; second, because Appalachian and Brooklyn Cooperage are not joint tort-feasors who have both acted to "cause" an injury to Lincoln; third, Appalachian is allowed to recover the total amount which it has been made to pay to Lincoln, not just a pro rata share allowed a joint tort-feasor who seeks contribution; and, fourth, the prescription applied to the case is the one year tort prescription reckoning from the day Appalachian is condemned to pay the judgment obtained against it by Lincoln. This delay in the commencement of prescription is sought to be justified on the theory that only at that instant does Appalachian sustain an injury under Article 2315 of the Civil Code, which Brooklyn Cooperage is obliged under the same codal article to repair. In short, under this theory Appalachian is legally subrogated to Lincoln's cause of action and at the same time acquires a separate cause of action of its own in tort against Brooklyn Cooperage. Under the strict rules applicable to contribution among joint tort-feasors through legal

subrogation which existed when the Appalachian Case was decided, however, the subrogee Appalachian acquires only the right of the subrogor Lincoln; and if the latter's claim against Brooklyn Cooperage has prescribed, then Appalachian's cause of action would also be lost. There is an irreconcilable inconsistency in the reasoning of the Court on this aspect of the case. Williams v. Marionneaux, 240 La. 713, 124 So.2d 919 (1960); Marquette Casualty Co. v. Brown, 235 La. 245, 103 So.2d 269 (1958); Forcum-James Co. v. Duke Transportation Co., 231 La. 953, 93 So.2d 228 (1957); Cox v. Shreveport Packing Co., 213 La. 53, 34 So.2d 373 (1948); Quatray v. Wicker, 178 La. 289, 151 So. 208 (1933); and Garvey v. Great Atlantic & Pacific Tea Co., 125 So.2d 634 (La.App.1961).

Though the decisions in these cases point out the error of the theory employed in the Appalachian decision, they do not offer an alternative theory or legal justification for allowing recovery against the party actually at fault by a party who has been compelled to pay for the damage caused by that fault and who is only technically, vicariously, derivatively or constructively at fault.

Later in the year when the Appalachian Case was decided, the Court also decided Foster & Glassell Co. v. Knight Bros., 152 La. 596, 93 So. 913 (1922) in which it interpreted the Appalachian Case. At that time it redefined the basis of the

action for indemnity as a cause arising out of "implied or quasi contract."

The cause of action arose when Foster & Glassell Co., as employer, satisfied the workmen's compensation claim of one of its employees Morris, who had sustained injuries caused by the negligent fault of Knight Bros. Having satisfied the compensation claim, Foster & Glassell Co. initiated suit for reimbursement against Knight Bros. To this action against it, the defendant filed a plea of prescription of one year under the theory that the claim for reimbursement rested on Article 2315 of the Civil Code. The Court in its opinion discussed the nature of the action:

"It is said by defendant that the action is one ex delicto, and that plaintiff can have no greater rights than those of Pink Morris against defendant, a third person, through whose fault the injury is alleged to have occurred. This is undoubtedly true, in so far as the claim is for and on behalf of Morris; but plaintiff had two causes of action under the law, the one for and on behalf of Morris [under the Workmen's Compensa-

tion Act], and the other for indemnification, as upon an implied or *quasi contract* to be reimbursed for money which it was compelled to pay on account of the fault of defendant, for which, under the allegations of the petition, it was in no wise responsible. * * *

\* \* \* \* \* \*

"* * * where two persons are liable to another for injuries received, the one because of fault or negligence, and the other merely because of statutory requirements or duty, but without actual fault, the latter, upon paying for the injury so inflicted, may recover of the tort-feasor as indemnity the sum so paid as upon an *implied or quasi contract*." (Emphasis added.)[2]

We again sought to find a proper basis for a claim for indemnity in Plummer v. Motors Insurance Corporation, 233 La. 340, 96 So.2d 605 (1957) saying:

"* * * in this third-party action what the insurance company is saying to the third-party defendant is, in effect: 'Your act caused the breach of my obligation to plaintiff, and as a result of

2. The holding of this case has been overruled by Marquette Casualty Co. v. Brown, 235 La. 245, 103 So.2d 269 (1958) insofar as it applies to the case of an employer's attempted recovery from a tort-feasor of the amount which he has been made to pay an injured employee in workmen's compensation. Marquette Casualty Co. v. Brown held that under special provisions of the Workmen's Compensation Act, the employer's action was in legal subrogation. The reasoning in the Foster & Glassell Case, nevertheless, remains relevant to a consideration of the rights of a party to claim reimbursement for the payment of damages where it is only technically liable and the damage is due to the fault of the party against whom reimbursement or indemnity is sought, where the remedy in such a situation is not specifically defined and prescribed by statute.

this breach you should pay or indemnify me for any sum for which I may be cast.' In other words, the insurance company in its action against third-party defendant is not seeking an award in damages for the wrongful and unlawful conversion of the property, but is only seeking *indemnification in quasi-contract* for any sum for which it may be cast in plaintiff's suit because of the breach of its obligation. * * * Under these circumstances the prescription provided in Article 3536 is without application (that is, the prescription for a tort)." (Emphasis and parentheses added.)

In Edward Levy Metals, Inc. v. New Orleans Public Belt Railway, 243 La. 860, 148 So.2d 580 (1963) the Court again reaffirmed the classification of a claim for indemnity as an action in quasi contract. We declared there:

"* * * We think the claim is one in indemnity, which is quasi contractual and governed by the prescription of Article 3544 of the Civil Code. The obligation that the third party plaintiff is seeking to enforce here is one for *unjust enrichment* to be enforced in the future in that third party plaintiff is to be indemnified in the event he is compelled to pay the principal plaintiff on account of the (unjust enrichment) * * * of third party defendant.

"The allegations of the third party petition sounding only in *quasi contract*

we need not determine their sufficiency otherwise—only that they do not sound in tort and are therefore not prescribed in one year." (Parentheses and emphasis added.)

Thus it may be seen that the principles supporting the action for indemnity have undergone an interesting development. A reference to civil law authorities should be helpful in our effort to more thoroughly coordinate this relief with the principles upon which the Civil Code is founded.

In all civil matters, where there is no express law, the judge is bound to decide according to equity. La.Civil Code art. 21 (1870). There is, moreover, in our law the moral maxim "that no one ought to enrich himself at the expense of another." La.Civil Code art. 1965 (1870). This latter article announces the principle of unjust enrichment.

These principles apply to the facts of the case at bar. Although not always referred to, they were the underlying reasons for the decision of those cases which have allowed recovery under the concept of indemnity to which we have referred; the later cases cited, we have already noted, having more properly characterized the action for indemnity as an action or claim in quasi contract for unjust enrichment.

"Certain obligations are contracted without any agreement, either on the part

of the person bound, or of him in whose favor the obligation takes place.

"Some are imposed by the sole authority of the laws, others from an act done by the party obliged, or in his favor.

\*   \*   \*   \*   \*   \*

"The obligations, which arise from a fact, personal to him who is bound, or relative to him, result either from quasi contracts, or from offenses and quasi-offenses." La.Civil Code art. 2292 (1870).

"Quasi contracts are the lawful and purely voluntary act of a man, from which there results any obligation whatever to a third person, and sometimes a reciprocal obligation between the parties." La. Civil Code art. 2293 (1870).

"All acts, from which there results an obligation without any agreement, in the manner expressed in the preceding article, form quasi contracts. But there are two principal kinds which give rise to them, to wit: The transaction of another's business, and the payment of a thing not due." La.Civil Code art. 2294 (1870).

Thus the general concept of quasi contractual obligations is clearly and succinctly stated. Article 2294 does not purport to enumerate the exclusive factual situations which can give rise to quasi contractual

obligations; it only enumerates the "two principal kinds", the transaction of another's business (negotiorum gestio), and the payment of a thing not due (condictio indebitati). The implication is that there are others, Colin et Capitant, Cours Elementaire De Droit Civil Francais, T. 2, n° 10, p. 8 (10th ed. 1953); Dalloz, 10 Jurisprudence Generale Du Royaume, "Obligations", Ch. 7, Sect. 1, p. 777 (1830); Planiol et Ripert, Traite Pratique De Droit Civil Francais, T. 7, "Obligations," n° 719, p. 1, 2 (2d ed. 1954).

■ There is a general concept of quasi contractual obligations;[3] it is a concept based upon the principle that where there is an unjust enrichment of one at the expense or impoverishment of another, then the value of that enrichment or else, in some cases, the amount of the impoverishment must be restituted. Planiol, Traite Elementaire De Droit Civil, T. 2, n° 812, n° 813 (8th ed. 1939).

Under this general theory of quasi contractual obligations founded upon an unjust enrichment we find the civil law action *de in rem verso*. See Nicholas, Unjustified Enrichment in Civil Law, Part I, 36 Tul.L. Rev. 605 (1962), Part II, 37 Tul.L.Rev. 49 (1962). The *actio de in rem verso,* although recognized by this Court long ago, was not

3. Planiol having enumerated the two types of quasi contractual obligations specifically mentioned by the Code Napoleon, concludes that these categories are not exclusive. Planiol et Ripert, Traite Pratique De Droit Civil Francais, T. 7, Obligations, n° 719, p. 2 (1954).

treated definitively and was only applied in the two cases to which we referred above. Garland v. Scott's Estate, 15 La.Ann. 143 (1860); Payne & Harrison v. Scott, 14 La.Ann. 760 (1859).

The action, however, has been well developed in France, influenced in large measure by the French Civil Code articles from which our own are copied. See Nicholas, supra. Nicholas says: "Among the essentials of the civil law remedy are its generality and its corrective or supplementary character."

An early statement of the *actio de in rem verso* is to be found in Patureau-Miran v. Boudier, Cour de Cassation (Ch.req.) June 15, 1892, (1893) S.I. 281, (1892) D.I. 596 (Fr.). Speaking of the derivation and nature of the action, the Court said:

"* * * It derives from the principle of equity which forbids enrichment at the expense of another, and since it has been regulated by no provision of the enacted law, its exercise is subject to no precise rules; it is sufficient that the plaintiff allege and undertake to prove that as a result of some sacrifice or act on his part he has procured an advantage to the defendant."

As Nicholas points out, in France the action has rightfully been subjected to limitations by the courts in its application. For, as he observes, "unregulated discretion is ultimately the negation of law." There are now five prerequisites to the successful suit by actio de in rem verso: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of "justification" or "cause" for the enrichment and impoverishment, and finally (5) the action will only be allowed when there is no other remedy at law, i. e., the action is subsidiary or corrective in nature. 36 Tul.L.Rev. 605, 610.

As to the first three prerequisites, these are operable in any other recognized action for unjust enrichment in Louisiana, such as negotiorum gestio or condictio indebitati. As to the fourth prerequisite to the action, this same requirement of an absence of a "justification" would apply in Louisiana under the general provisions of our codal articles which announce the principle of unjust enrichment; that there is no "justification" is inherent in the definition of "unjust". The fifth requirement, that there be no other remedy available at law, is simply an aspect of the principle that the action must not be allowed to defeat the purpose of a rule of law directed to the matter at issue. It must not, in the language of some writers, "perpetrate a fraud on the law." Article 21 of the Louisiana Civil Code prohibits a reference to principles of equity in cases which would allow application of more specific legal action.

■ The remedy afforded by the actio de in rem verso is not unlike that allowed by the action for indemnity under Louisiana jurisprudence. The remedies and prerequisites of the action de in rem verso are also found to be compatible with the principles of our Civil Code and we will apply them to this case allowing recovery by Minyard against Curtis in the amount of the judgment paid by Minyard to Pittman only, with legal interest on that amount from the date of judicial demand in this suit until paid, and for all costs of this suit.

■ Since, under the principles announced, the cause of action does not come into being until the party seeking recovery for unjust enrichment has been compelled to discharge the obligation which forms the basis for the unjust enrichment claim, the prescriptive period in the case at bar will be reckoned from the day Pittman obtained judgment over against Minyard. And we shall apply to that situation the prescription of ten years provided by Article 3544 of the Civil Code applicable to quasi contracts, for the claim is one in quasi contract. Clearly, under this theory, the claim is not prescribed.

For the reasons assigned, the judgment of the trial court and the Court of Appeal maintaining the pleas of prescription filed herein are reversed and set aside, and this cause is remanded to the trial court to be proceeded with in accordance with law and the views expressed herein.

HAMITER, J., concurs in the result.

HAWTHORNE, J., concurs in the decree.

McCALEB, J., dissents being in accord with the views of the Court of Appeal. See La.App., 192 So.2d 208.

HAMLIN, J., dissents being of the opinion that the result reached by the Court of Appeal is correct.