BLANCHE, Judge.
Plaintiff-appellant, Robert C. Landes-man, appeals a judgment of the Twenty-Second Judicial District Court, dismissing his suit against the defendants-appellees, Ford Motor Company and Ford Motor Credit Company. We affirm.
On April 29, 1970, plaintiff entered into a written agreement to purchase the assets of a financially troubled Ford Motor Company dealership, Gall-Naman Ford, Inc., Slidell, Louisiana. Under the agreement, plaintiff was to incur all of the expenses and receive all of the profits, if any, that he made while operating the dealership. At that point, the plaintiff did not own a franchise to operate a Ford dealership, and to complicate matters, the defendants were not a party to this agreement.
However, plaintiff and the owners of Gall-Naman were aware that Ford and Ford Motor Credit, which supplies a line of credit to Ford dealerships, would require that plaintiff establish himself as the new dealer. Therefore, on May 5, 1970, the plaintiff and Michael E. Ñaman, one of the owners of Gall-Naman, met with a representative of Ford Motor Company, Don Ford, to arrange for plaintiff’s application for a franchise.
At that meeting plaintiff was advised by Mr. Ford that although the Ford Company could not prevent plaintiff from purchasing the assets of Gall-Naman prior to his obtaining a franchise in his own name, the Ford Company, nevertheless, viewed the transaction as irregular. Regardless, the plaintiff’s application was taken and Mr. Ford requested that plaintiff submit various reports and financial statements in conjunction therewith.
The plaintiff acknowledged that he was cautioned by Mr. Ford that he was dealing with Gall-Naman at his own risk and that there was no assurance that plaintiff would, in fact, be given a franchise.
In fact, two weeks after the May 5 meeting, plaintiff was notified that his bid was going to be rejected due to the inexperience of plaintiff’s proposed management team and also because of inadequate capi *108 talization of the proposed corporation.[1] In an effort to remedy these problems, Mike Ñaman was added to the management team and a revised corporate structure was submitted.
However, due to conflicts between the plaintiff and Ñaman, coupled with Na-man’s inability to obtain capital, plaintiff decided to eliminate his name from the proposed organization.
Plaintiff then added the name of Charles Gross to the list. Gross had prior experience as general manager of another agency and was sales manager for Gall-Naman at the time plaintiff purchased the assets of the dealership. Another revised capital structure was submitted in the first week of July, but the plaintiff’s application was formally rejected by the Ford Company on July 23, 1970. On July 27, the dealership closed its doors.
The record discloses that on May 1, 1970, in spite of the fact that the plaintiff was not an authorized dealer and had no guarantee of ever becoming one, and also in spite of the warnings by Don Ford to proceed at his own risk, the plaintiff began operating the dealership on his own. Plaintiff’s right to operate the dealership stemmed only from his agreement with Gall-Naman, as he had no contract with either of the defendants.
Pursuant to the agreement with Gall-Na-man, plaintiff received all credit for automobile sales and also the profits from the agency. The credits and profits were received from Ford Motor Credit Company in the form of checks payable to Gall-Na-man. Under their agreement, Gall-Naman would then endorse said checks over to plaintiff, who would deposit them in his own account. Therefore, the record is clear that during the entire period that plaintiff operated the dealership on his own, he knew or, as a reasonable man, should have known that Gall-Naman was the only entity recognized by either of the defendants. Plaintiff knew that whatever profits he received came from Gall-Naman and not from the defendants and that his only claim to said profits was through his contract with Gall-Naman.
In effect, plaintiff actually operated a Ford Motor Company dealership under a contract that existed between the former owners and Ford. He sold Ford automobiles which were on hand when he took over, and he also purchased other Ford automobiles from nearby dealers for resale. He purchased parts and performed repairs and even performed warranty work on eligible Ford products. Nevertheless, throughout the entire period that plaintiff occupied the dealership, neither Ford nor Ford Motor Credit had any dealings whatsoever with plaintiff. All business was transacted directly with Gall-Naman. As to Ford, plaintiff was no more than an al-terego of Gall-Naman.
The plaintiff paid cash for most of the parts and products bought from Ford since Gall-Naman’s credit had been severed by the company.
All credit for automobiles sold was issued by check from Ford Motor Credit to Gall-Naman, who, pursuant to their, agreement, endorsed them over to plaintiff.
In July when plaintiff’s application was rejected, the dealership closed its doors. At that point, approximately $7,000 in dealer’s profits resulting from the sale of automobiles by the plaintiff was applied to the indebtedness of Gall-Naman. According to the testimony of Mike Ñaman, he instructed Ford Motor Credit to make that entry to offset money he alleged was owed to him by the plaintiff.
At that point, plaintiff sued both Ford Motor Company and Ford Motor Credit, *109 contending that he was due the $7,251 credited to Gall-Naman’s account. Additionally, he sued for $2,765.21 for finance participations; $5,138.73 for warranty work and policy claims; $543.39 for jobbing incentives; and $1,102 for payments plaintiff made on demonstrator automobiles owned by Gall-Naman. Credited against the total sued for was $4,440.93 which was owed to Ford Motor Company for parts. Presumably, the other monies due the dealership were also credited to the account.
The defendants filed a third party demand against Gall-Naman for indemnity against any loss they might suffer.
The plaintiff did not sue for failure to be awarded the franchise, nor did he sue Gall-Naman. As previously noted, plaintiff’s suit was dismissed.
On appeal the plaintiff argues that the defendants entered into an agreement with Gall-Naman whereby Ford was to transfer all credits and profits which were due Gall-Naman to the plaintiff. Plaintiff asserts this was a stipulation pour autri in his favor and should be enforced against the defendants to allow him recovery.
However, contracts for the benefit of others, or the stipulation pour autri, must be in writing and clearly express that intent, Fontenot v. Marquette Casualty Company, 258 La. 671, 247 So.2d 572 (1971). There was no such writing to evidence the express intent of these parties. Consequently, plaintiff’s argument is without merit.
Plaintiff’s contention that an implied or quasi contract existed between him and the defendants also lacks merit.
According to LSA-C.C. Art. 1816:
“Actions without words, either written or spoken, are presumptive evidence of a contract, when they are done under' circumstances that naturally imply a consent to such contract. * * * ”
In the instant case, the facts are such that we do not find that by their actions, the defendants impliedly consented to treat the plaintiff as an authorized dealer and thereby accord him all of the benefits thereof, such as payment of profits. In fact, plaintiff at all times was aware that the defendants would not deal directly with him, but rather that all transactions regarding the dealership were carried on with Gall-Naman. All the while, plaintiff knew the position of the defendants with regard to his occupancy of the dealership.
The plaintiff, nevertheless, argues that a quasi contract existed, founded on the principle of unjust enrichment, i. e., de in rem verso, citing Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967). Plaintiff reasons that the defendants were enriched due to his efforts in selling automobiles and operating the dealership, to the extent of the sums prayed for in his petition. Since the instant suit is directed only against Ford Motor Company and Ford Motor Credit, this argument overlooks the fact that it was Gall-Naman who was really enriched in this case. Gall-Naman received the benefit of the credits due to the dealership. The defendants had no method by which to grant profits to an unfranchised individual such as the plaintiff.
His contract with Gall-Naman allowed plaintiff to make all the profit that was due the dealership, but when plaintiff entered the contract, he did not consider the fact that the dealership was in arrears on its payment to the defendants and consequently, the profits of the dealership would suffer until the arrearage was corrected. When the plaintiff’s request for a franchise was refused, Mike Ñaman, on behalf of the authorized dealership, requested that all profits and credits be given to Gall-Naman. By crediting that account, defendants were simply following the suggestions of its authorized dealer.
*110 The long and short of the entire matter was correctly summarized by the trial judge in his Reasons for Judgment:
“The evidence does not show any basis for creating an obligation for Ford to Landesman because of Ford’s knowledge of the Landesman-Gall-Naman arrangement. In fact, the evidence shows to the contrary that representatives of Ford specifically warned Mr. Landesman that his dealings with Gall-Naman could not render any liability on the part of Ford. Actually they were very careful to carry on their dealings only with Gall-Naman.
“There might be a question as to liabilities between Gall-Naman and Landes-man, but as to the defendants before the court there is no basis for liability.” (Reasons for Judgment, Record, pp. 96-97)
Lastly, plaintiff claims that he paid $1,110.96 to Ford Motor Credit under duress and, accordingly, that he is entitled to a return of that sum. The payment was to correct Gall-Naman’s arrearage on interest and monthly notes on demonstrator and “floor plan” automobiles.
Plaintiff’s version of the facts shows that he was told by a “Mr. Harvill,” the area manager for Ford Motor Credit, that unless he paid the arrearage, he would not be given the franchise. Plaintiff, not wishing to lose the franchise on that account, paid the arrearage. This version of the facts was corroborated by plaintiff’s accountant, John Coerver.
However, the testimony of Mike Ñaman does not support plaintiff’s position. Ña-man testified that in the beginning before Coerver entered the picture, plaintiff, Ña-man and Harvill were discussing the change of ownership, and Harvill inquired about the past due account. In plaintiff’s presence, Ñaman informed Harvill that since plaintiff was assuming responsibility for all debts of the dealership, he would also pay the arrearage. Plaintiff did not object to the arrangement at that time.
However, at a later date, when Coerver informed the plaintiff that under his agreement with Gall-Naman he ought not to be liable for the past due accounts, plaintiff had a change of heart and decided he no longer wanted to pay the arrearage. It was at that point that plaintiff contends he was threatened with losing the franchise if he did not pay.
After this alleged threat, plaintiff paid the arrearage over the objection of Coer-ver. Since plaintiff had already consented to pay all the debts of the dealership, the threat was not his cause for paying. In reality, plaintiff paid because he was fulfilling his obligation to Gall-Naman to pay all of the debts of the dealership in exchange for the profits.
We also note that the trial judge did not find duress, since he disallowed plaintiff’s claim. In view of the evidence presented at trial, we cannot say that his factual conclusion was manifestly erroneous.
For the above and foregoing reasons, the judgment of the trial court is affirmed, at plaintiff-appellant’s cost.
AFFIRMED.

. The facts reveal that the plaintiff attempted to incorporate with several other stockholders. However, the corporation never came into existence due to the failure to file the articles of incorporation with the Secretary of State as required by law. Therefore, the plaintiff instituted this suit in his own name.