MARVIN, Judge.
These consolidated cases between a mortgage company and a builder arose because *759 the builder changed plans for the financing of a $2,000,000 apartment complex from a government-funded loan by the mortgage company (Mid-South) to a conventional loan by a bank. When the mortgage company obtained a refund of $15,000 as a,portion of the commitment fee it had paid the government, the builder sued the mortgage company for a refund. In turn, the mortgage company sued the builder for a $36,200 financing and service fee which it claims it had “earned” and to which it would have been entitled had the builder made the government funded loan as planned.[1]
The lower court rendered judgment in favor of the builder for $10,000 without interest, in effect allowing the mortgage company to retain $5,000 for its services to the builder and otherwise rejected the demands of each litigant. The appeal of the mortgage company was answered by the builder, who seeks to increase the judgment to an amount equal to the $15,000 refund.[2]
Under the National Housing Act (now 12 U.S.C.A. § 1701 et seq.), the government appropriates and provides funds to lenders at a lower than market interest rate to encourage the construction of multi-family housing. Lenders apply for approval of funds for proposed construction and “purchase” a commitment of funds for a specified period of time (in this case, three years) by paying a fee to the government. In this case the fee was two percent of the amount applied for, or $40,112. If the commitment is cancelled before its time period expires the lender may obtain a partial refund from the government. In this case $15,042 was refunded.
The builder here had done business with the mortgage company on other projects before the planning of this project was begun in 1974. This was the first project of these parties, however, which was to be funded under section 221 d(4) of the National Housing Act. The Act is silent with respect to the borrower’s right to claim refund from the mortgage company of amounts paid the mortgage company by the borrower. These parties expressed no agreement on a refund during the time they were planning for 221 d(4) funding from October 1974 to mid-July 1975.
The apartment project is known to those involved as Orleans Square. Preliminary planning began in October, 1974. On December 19, 1974, Mid-South mailed the initial application to the Federal Housing Administration’s Shreveport office (FHA) with supporting documents. This produced what is called a SAMA (Site Appraisal and Market Analysis) letter from FHA which was explained as the government’s approval of the feasibility of the project and its tentative willingness to insure the financing of the project with government funds by and through GNMA (Government National Mortgage Association). The SAMA letter from FHA was dated January 23, 1975. Telephonic request by the mortgage company to GNMA after the SAMA letter issued resulted in GNMA’s acceptance of the mortgage company’s offer to purchase a commitment of government funds. The mortgage company is referred to by GNMA sometimes as the seller of the mortgage securing the loan. This acceptance established generally that GNMA would allow the mortgage company to purchase a commitment *760 for three years beginning January 24, 1975, of funds at 8.25 percent interest expressly for the financing of the Orleans Square project. The amount GNMA would commit, subject to FHA requirements, was shown as $2,005,600 and the commitment fee required by GNMA was $40,112.
About the time the FHA SAMA letter and the GNMA commitment issued, the mortgage company bound itself to the builder to provide interim and permanent financing for the project and requested and obtained from the builder his check payable to the mortgage company for an amount equal to the commitment fee. The mortgage company then sent its own check to GNMA to purchase the commitment. The mortgage company then began preparing additional data for the multitude of forms required by FHA. The builder and the mortgage company sought to have FHA insure or guarantee the $2,000,000 figure, 90 percent of the estimated cost of the project. On April 17, 1975, FHA agreed to insure or guarantee only $1,800,000, or 80 percent, of the estimated cost of the project. The builder, however, made no complaint regarding the reduced guarantee of the government and as hereafter mentioned, constructed the apartment complex with a $1,500,000 conventional bank loan.
A few days before July 21, 1975, the builder informed the mortgage company that he did not want to proceed with the 221 d(4) financing because of “too much red tape”.[3] The builder confirmed this by his letter of July 21, 1975, to the mortgage company and expressly requested the mortgage company to terminate the commitment which had been purchased (“our . commitment”, the letter said) “. and refund monies to [the builder].” The refund of $15,000, which was made payable to the mortgage company by GNMA on July 22, 1975, is the subject of this lawsuit.
Sometime before July 14,1975, the builder made application to a Shreveport bank for a conventional loan, for on that date the bank wrote the builder that it was willing to lend him $1,500,000 at 9.5 percent interest. The loan was eventually made and the project was constructed.
The builder contends that he should have judgment in his suit for the refund.
The mortgage company contends that it should have judgment in its suit for the $36,200 financing fee or alternatively, for an amount equal to the reasonable value of its services and its undertakings to and for the builder.
The lower court correctly concluded that there was no understanding between the litigants regarding the contingency of any refund. The lower court also correctly found no general practice to exist in the industry of this type financing for construction regarding refunds of amounts paid in this situation. We find that there was a general practice in the industry that the builder would be charged by the mortgage company an amount at least equal to the fee the mortgage company was required to pay the government for its commitment of the funds applied for. In this case the mortgage company committed itself to provide interim and permanent financing under this type project when the government conditionally agreed to guarantee or to insure the amount applied for. With the government guaranteeing or insuring the loan, the security (mortgage note) to be signed at final closing would become more merchantable by the mortgage company, who in this case could have sold the loan after closing and retained the status of servicer of the loan or who could have retained the position of the secured creditor itself.
Except in cases where the mortgage company performs more than routine services for the builder, the fee charged the builder *761 for the mortgage company’s commitment to provide interim and permanent financing is not more than the fee charged by the government for the purchase of the commitment. We also find that the parties in such instances, and whether the mortgage company is serving as mortgage' banker (which itself commits to provide interim and permanent financing) or as mortgage broker (which attempts to find others to make these commitments), contemplate that the mortgage company’s payment for its services and commitments will come from the financing fee which is usually paid by the builder-borrower when the final closing of the loan occurs. Nothing more than routine services were contemplated by these litigants.
The check by which the builder paid the mortgage company ($40,112) was in the exact amount of GNMA’s charge for the commitment fee. Nonetheless, this payment is not conditioned or qualified in any way. It was payable only to the mortgage company and in the absence of proof that it was qualified or conditioned, we must conclude that it was in payment of the commitment of the mortgage company to the builder to provide interim and permanent financing for the apartment project and of the mortgage company’s obtaining and purchasing the government commitment and preparing to the government’s satisfaction the multitude of forms necessary to acquire the government’s funding or insuring of the loan. The mortgage company here performed more than 50 percent of its services before the builder changed his mind. If the original method of financing had been consummated as planned, however, the mortgage company would have received nothing from the commitment fee.
In view of this mortgage company’s experience with this builder and of the experience of both with government funded or government insured financing of single family residences, we find both litigants were fully aware that the builder was privileged to change his plans for the government funded or government insured financing of the cost of the project at any time before the final closing of the loan. In other words, while the government may have bound itself by the commitment to permanently finance or insure the financing of the project, the builder was at no time bound to consummate this type financing. While the mortgage company may have bound itself to provide interim and permanent financing in the manner contemplated, the builder was not precluded from changing the method of financing.
The mortgage company did what the builder desired to be done until the builder changed his plans in July, 1977. Whether or not the builder was in good faith in changing his plans is material to the measure of damages, and is not material to the question of whether or not the mortgage company may recover from the builder. CC 1934(1).
In one earlier instance of government funding of this builder’s construction of single family housing (different from 221 d(4) multi-family housing), this builder agreed with this mortgage company to forfeit or waive his rights to a refund of the amount paid the mortgage company to purchase the government commitment and for the commitment of the mortgage company to provide financing.
The object of the contract between the mortgage company and the builder has been stated. The mortgage company agreed to provide interim and permanent financing for the builder’s project with government funded or government insured financing, to purchase the commitment from the government, and to complete the necessary paperwork to accomplish this. The builder would pay the mortgage company not more than what the government agencies required the mortgage company to pay during the time before final closing and upon final closing the builder would pay the mortgage company a two percent financing fee in addition to other fees which might be required.
“Where the object of the contract is anything but the payment of money, the damages due the creditor for its breach are the amount of the loss he has sus *762 tained, and the profit of which he has been deprived, under the following exceptions and modifications:
“1. When the debtor has been guilty of no fraud or bad faith, he is liable only for such damages as were contemplated, or may reasonably be supposed to have entered into the contemplation of the parties at the time of the contract. By bad faith ... is not meant the mere breach of faith in not complying with the contract, but a designed breach of it from some motive of interest or ill will.” CC Art. 1934(1).
In A. E. Landvoight, Inc. v. La. St. Emp. Ret. S., 337 So.2d 881 (La.App.1st Cir. 1976), the Retirement System contracted with the plaintiff, a mortgage banker, to service its loans in a much more detailed manner than here, but even there a borrower-builder from the System was not obligated to accept the servicing of the System’s loan by that mortgage banker. The System was obligated to request a borrower-builder to process the loan application through this mortgage banker. After the mortgage banker had serviced one application of a particular builder and had received a fee for that service, the same builder, but under another corporate name, made application to the System to borrow $13,500,000. The System did not request the builder to process that application through the mortgage banker, but processed the application itself, closed the loan, and collected a fee from the builder of $405,000. The mortgage banker sued for its one percent fee ($135,000) because of the System’s failure to request the builder to process the application through the mortgage banker.
Applying the principles of 1934, the Court of Appeal allowed compensatory damages of $5,000 to the mortgage banker, recognizing that no fee would have been owed the mortgage banker if the borrower had denied the request of the System that the mortgage banker process the application. The mortgage banker there offered no detailed proof of its expenses in processing such an application and the Court of Appeal found that the mortgage banker had not sustained a loss of the entire fee.
Likewise in this case, the mortgage company has not shown its usual expenses in processing such an application as this builder’s. The evidence also preponderates that the conventional bank loan made to the builder was not made substantially upon the strength of data prepared by the mortgage company, but upon the personal guarantee of the builder and his wife and upon the security of the project. There was no special benefit derived from these services in respect to obtaining the bank loan. The mortgage company is not entitled to the $36,200 amount it has sued for, also because both parties were aware that the builder was not obligated to consummate the government funded or government insured loan. These are “damages” not within the contemplation of the parties. CC 1934. See also Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967), discussing the elements of unjust enrichment.
We have found, however, that it is a general practice in the industry that the mortgage banker, for its commitment to the builder, charge the builder a fee at least equal to what the mortgage banker is required to pay the government for the government commitment. It is reasonable for us to suppose that the parties were silent upon the question of compensation for the mortgage banker in the event the builder chose not to consummate the government funded or insured loan for whatever reason, because they intended to let equity dictate the incidents of these details. See CC Arts. 1903, 1963 through 1967. These parties contracted, but did not provide this detail.
If the commitment purchased from the government had been cancelled earlier, the amount of the refund would have been greater and the services the mortgage company would have provided would have been less. If the commitment had been cancelled later, the refund would have been lesser and the services of the mortgage company would have been greater. It would be inequitable to say that no matter when the builder instructed the mortgage company to *763 cancel the commitment, one or the other should be entitled to the whole of the refund obtained from the government. It would likewise be inequitable to say that the mortgage company would be entitled to nothing for its services in the event the builder elected not to proceed further at any given time, whether or not a refund would have been paid at that time by the government.
The parties should have contemplated what, if anything, the mortgage company might have been owed for its services in the event the builder elected, as he was privileged to do, to cancel the commitment purchased from the government. What they should have provided for, the courts may provide. CC Art. 1965.
The result below is correct. The mortgage company showed only generally the extent of its services and we find no abuse of discretion in the lower court award which, in essence, is $5,000 for the services rendered by the mortgage company to the builder. The award is neither too high nor too low and does substantial justice.
The judgment of the lower court in each case is affirmed at the cost of the appellant in each case.

. Our figures are rounded to the nearest hundred. This $36,200 figure is two percent of $1,800,000, the amount the government agency eventually committed to fund. If the loan had been finally closed under this method of funding, the builder-borrower would have paid this amount to the mortgage company as a financing fee, in addition to other fees, all of which were listed on the initial application to the government, which was signed by both litigants. The amount applied for was more than $2,000,000. The amount eventually committed was $1,800,000. The financing fee which is paid at the closing of the loan is a different fee from, and is in addition to, the fee paid for the commitment.

. These cases were tried before, but not submitted to, a district judge who resigned his position. They were submitted to and decided by another district judge about 14 months after trial. See and compare Moore v. Travelers Indemnity Co., 352 So.2d 270 (La.App.2d Cir. 1977) with State Through Dept. of Highways v. McInnis, 360 So.2d 887 (La.App.3d Cir. 1978). Art. 5, § 10, La. Constitution; CCP Art. 2164.

. Between April 17 and July 21, 1975, while he was troubled with lower back pain and was undergoing treatment, the builder nonetheless continued to work on the project with the mortgage company, the architect and others involved. The record shows that he corresponded with the FHA on April 29 and June 20 and with the Utility Commissioner of Shreveport on May 2 and that he contracted with the City of Shreveport on May 13, 1975, concerning Orleans Square.