JiLANDRIEU, Judge.
Plaintiff Larose-Perniciaro (L-P) appeals a trial court judgment dismissing its suit against defendant St. Bernard Parish Water and Sewerage Commission (Sewerage Commission), as Successor to the St. Bernard Sewerage District Nos. 1-2 (Sewerage District) from the lawsuit. We affirm.
FACTS
In 1977, L-P undertook development of a subdivision called St. Bernard Grove Extension No. 3 in an area serviced by St. Bernard Parish Sewerage District Nos. 1-2 (Sewerage District). When L-P sought permits to develop 239 lots in that area, the Sewerage District Board insisted that L-P construct a *434 new sewerage system which would service some 1,850 lots. The reason L-P was required to construct a system greatly in excess of the system necessary for its development was the Sewerage District Board’s policy against the construction of numerous small lift stations at each individual subdivision in the area. The system which L-P was required to construct was designed to service all future development in the area. The boundaries of the area which the sewerage system was designed to service was described in an October 26,1978, letter ^from a Burk & Associates engineer to the chairman of the Sewerage District Board as follows: “the area bounded by the Twenty and Forty Arpent Canals between and including Story Park Subdivision Extension and Meraux Lane Subdivision Extension.” Following completion of the construction of the sewerage system, the system was dedicated to the Sewerage District for perpetual maintenance.[1]
The increased size of the sewerage system which L-P was required to construct in order to gain approval for the development of its subdivision was accompanied by a parallel increase in the cost of the system.[2] Thus, LP sought reimbursement of the increased costs through various negotiations with the Sewerage District. The official minutes of the Sewerage District indicate that the issue was discussed at least six times, as indicated from the excerpts from the minutes quoted below:
After a lengthy discussion of St. Bernard Grove Subdivision Extension No. 3, the Consulting Engineers were requested to ascertain the cost differential between installing the sewer system to sufficiently handle the acreage for the entire area as opposed to lajust handling St. Bernard Grove Subdivision Extension No. 3.
Sewerage District Minutes of July 18, 1979.
After a lengthy discussion by all present the Board requested that Mr. Cusimano ask for a legal opinion from the Louisiana State Attorney General’s Office to determine if a credit can be granted a developer for expenses incurred for installing a sewer system with a larger capacity to accommodate adjacent landowners.
Sewerage District Minutes of July 25, 1979.
On a motion by Mr. Ziegler, seconded by Mr. Romero and unanimously passed, the Board discussed a proposal agreement submitted by Messrs. Rene Larose and Peter Pemiciaro in connection with St. Bernard Grove Extension No. 3 Subdivision but no official action was taken.
Sewerage District Minutes of July 21, 1983.
Mr. Larose and Mr. Pemiciaro discussed with the Board the contract relative to St. Bernard Grove Extension No. 3 but no official action was taken.
Sewerage District Minutes of July 27, 1983.
After much discussion and on a motion by Mr. Cabirac, seconded by Mr. Romero and unanimously passed, the Board authorized the Chairman to execute a service *435 agreement between the Board and Mr. Rene LaRose and Mark Perniciaro in connection with future tie-ins into the existing sewer system, namely, the lift station located on Genie Street in Story Park Extension. Mr. Guenoit wanted it officially indicated in the minutes that he was not asked to give a legal opinion of said service agreement.
Sewerage District Minutes of August 8,1988.
After a lengthy discussion and on a motion by Mr. Ziegler, and second by Mr. Romero, the Board established a rate of $250.00 per lot to be collected by La-Rose [sic] Perniciaro Corporation in connection with the prior contract executed between them and the Board concerning St. Bernard Grove Extension No. 3 Subdivision. Mr. Richard abstained on said motion.
Sewerage District Minutes of September 15, 1983.
[4The actions taken on August 8, 1983, and September 15,1983, were officially memorialized by the Sewerage District Board in a motion certified by the director of the Sewerage District on October 12, 1983, which provided as follows:
After much discussion a motion was offered by Mr. Ziegler and seconded by Mr. Romero to authorize the Chairman of the Board to execute an agreement between the Board and LaRose-Perniciaro Corporation to allow said corporation the authority to collect from any future developer a sum of $250.00 per lot for all sewerage connections that flow into St. Bernard Grove Extension No. 3 lift station located on Genie Street. Mr. Richard abstained on said motion.
Despite the above actions of the Board, no written agreement was ever executed to formalize the alleged agreement between the Sewerage District and L-P.
L-P recouped some of its monies through payments from landowners in the area. L-P was paid $50,000[3] by John Klees, Jr., who developed Story Park Subdivision immediately adjacent to St. Bernard Grove Extension No. 3. Further, Terry Tedesco, Inc. (Tedes-co) tendered $3,828[4] to L-P as consideration for running sewerage to 11 lots owned by that company adjacent to St. Bernard Grove Extension No. 3; those 11 lots were never developed. L-P claims that it had not received any compensation for 1,420[5] lots at the time it filed suit.
The dispute which gave rise to the instant case began when Tedesco commenced development of a new subdivision, called Deer Creek Subdivision, _| gon land within the boundaries of the area which the sewerage system installed by L-P was designed to service. When L-P approached Tedesco requesting payment of $250 per lot, Tedesco informed L-P that it was being required by the Sewerage Commission, successor to the Sewerage District, to construct an entirely new sewerage system. The new system which Tedesco was required to install was designed to service its new development, as well as an existing adjacent area which had been experiencing problems with its overloaded sewerage system. Thus, Tedesco refused to pay L-P $250 for the lots it was developing.
L-P filed the instant suit against the Sewerage Commission, as successor to the Sewerage District, as well as their respective insurers, seeking $315,750[6] in damages for breach of contract, or alternatively, for unjust enrichment. Terry Tedesco was released from the suit during the process of the trial, leaving only the Sewerage Commission *436 as defendant. The trial court rejected both of the plaintiffs theories of recovery against the commission. L-P has appealed.
In its reasons for judgment, the trial court indicated that its rejection of the plaintiffs breach of contract claim was based on the undisputed fact that no written contract was ever executed between the Sewerage District and L-P. Regarding the unjust enrichment claim, the trial court noted that it was regular and customary for developers of raw land to install sewerage and drainage lines to service their property. Thereafter, the Sewerage Commission would perpetually maintain these lines.
^DISCUSSION

ASSIGNMENT OF ERROR NO. 1

Plaintiff contends that the trial court erred in determining that no contract was ever confected between the Sewerage District and L-P and maintains that the passage of a resolution by the Sewerage District calling for an agreement between the Sewerage District and L-P, which was later approved by a motion to execute said agreement but not formally carried out by the Sewerage District’s Chairman of the Board, constituted a binding contract. Plaintiff further alleges that the formal execution of the agreement by the Chairman of the Board was merely a perfunctory memorialization of a prior binding agreement with the Sewerage District.
A contract is defined as “an agreement, by which one person obligates himself to another, to give, to do or permit, or not to do something, expressed or implied by such agreement.” LSA-C.C. article 1761. For a valid contract to exist, there must be (1) parties legally capable of contracting; (2) their consent legally given; (3) a certain object, which forms the matter of agreement; and (4) a lawful purpose. LSA-C.C. article 1779; Morphy, Makofsky & Masson, Inc. v. Canal Place 2000, 538 So.2d 569 (La.1989). A contract can be express or implied in fact. An implied in fact contract is one which rests upon consent implied from facts and circumstances showing mutual intention to contract. Morphy, supra; V-8 Taxi Cab Service, Inc. v. Hayes, 322 So.2d 442 (La.App.4th Cir.1975). Such implied in fact contracts are not different in their legal effect from express, written agreements. Comment, Actio De In Rem Verso in Louisiana: Minyard v. Curtis Products, Inc., 43 Tul. L.Rev. 263, 298 (1969).
(Quoting from Whitney Nat. Bank v. Poydras Ctr. Assoc., 557 So.2d 422, 424-25 (La.App.4th Cir.1990)).
In the instant case, no written contract was ever executed between the parties. The Sewerage District was concerned that such an agreement would violate the public bid law and would be against public policy. To allow a developer to construct sewer improvements and then after the fact permit that frsame developer to be reimbursed for the cost from future users would circumvent the Public Bid Law and would constitute a franchise to collect monies for a system that is owned and operated by the public agency.
Concerned about the legality of such an arrangement, Michael R. Merkle, a director on the Sewerage District’s Board at that time, consulted with the District Attorney’s Office by letter dated July 25, 1983, for a legal opinion on the following: “Can St. Bernard Sewerage District No. 1-2 charge future developers an amount to equal the pro rata share for sewerage improvements that were previously constructed by the original developer for the entire area and then in turn reimburse said original developer these monies.” Although there is no indication in the record that the Sewerage District was ever informed in writing concerning this matter, it was advised orally that such an agreement would in fact be illegal. Thus, the Sewerage District’s Chairman of the Board decided not to execute a proposed contract between the parties.
Plaintiffs Exhibit No. 8 purports to be the “prior contract” described in the Sewerage District’s Minutes of September 15, 1983, which was never signed but which had been executed according to the minutes. That agreement bound the Sewerage District to collect from owners of lots tying into the system $250 per lot and to pay to L-P that which it collected. However, the minutes of the meeting of August 8, 1983, identifies only *437 Story Park Extension from which L-P was paid $50,000.
In the minutes of September 15, 1983, the Sewerage District Board established a rate of $250 per lot to be collected by L-P.
The minutes of October 12, 1983, authorized the Chairman of the Board to execute an agreement between the Board and L-P allowing L-P to collect $250 per lot for sewerage connections.
|gNo contract was signed obligating the Sewerage District to collect $250 per lot for L-P’s benefit and none was signed authorizing L-P to collect $250 per lot for its own benefit.
Realizing that it could not collect from users of the system and legally pay L-P, the Board, after the system was completed and transferred to the Sewerage District, tried an alternative method, i.e., authorize L-P to collect directly from the owners tying into the system. However, that agreement (Plaintiffs Exhibit No. 9) was also never signed by any of the parties.
The above agreement which was adopted on September 15, 1983, allowing L-P to collect $250 per lot from each future developer who tied into the system, was adopted after the sewerage system had been completed. Therefore, before construction of the system there was no meeting of the minds on cost or the method by which L-P would be reimbursed for installing the sewerage system.
The most that can be said in L-P’s favor is that the Sewerage Commission, after the fact, authorized L-P to collect $250 per lot for use of the system if it could. That does not constitute a contract between the Sewerage Commission and L-P. The Sewerage Commission did not agree to pay for the cost of the system nor did it commit itself to require other developers to use the system. Further, the Sewerage Commission did not obligate itself never to change its sewerage disposal plan. We conclude that the actions of the Sewerage Commission and L-P did not constitute a contract, oral or written, and if one had been entered into it would have been a “cost plus” contract awarded without public bid and as such contrary to public policy. See La.Rev.Stat.Ann. § 38:2212 et seq. (West Supp.1994).
Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR NO. 2

|zPlaintiff argues that the Sewerage District was unjustly enriched and plaintiff impoverished when the Board forced them to purchase and install a sewerage system greatly in excess of that needed for their development.
In Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (La.1967), the Louisiana Supreme Court established the following prerequisites before there can be a recovery for unjust enrichment: (1) there must be an enrichment; (2) there must be an impoverishment; (3) there must be a connection between the enrichment and the impoverishment; (4) there must be an absence of “justification” or “cause” for the enrichment and impoverishment; and (5) the action will only be allowed when there exists no other remedy at law.
We find this assignment to be without merit for several reasons. The Sewerage Commission was not enriched but rather was burdened by the dedication of the system. Voluntary compliance with a governmental regulation does not constitute impoverishment. The Sewerage Commission was justified in requiring a system with excess capacity to be built and L-P had a remedy at law if it believed the requirement to be arbitrary and capricious.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
PLOTKIN, J., dissents with written reasons.

. In order to install the lift station and sewer lines servitudes had to be obtained from various landowners. By the end of 1978, all the necessary servitudes of right of way for the sewer lines had been given. On August 7, 1979, the St. Bernard Police Jury, the governing authority of the Parish of St. Bernard, State of Louisiana, granted final approval of the development of St. Bernard Grove Extension No. 3 Subdivision to L-P. Prior to granting this approval, the police jury had obtained the approval of the St. Bernard Parish Sewer District # 1-2. We note that Peter Pemiciaro was a member of the police jury at that time.

. LaRose Contracting Corporation was the company which actually installed the lift station and line in accordance with the location plan of Eugene I. Estopinal & Associates dated June 26, 1978, the canal crossing plan of Burk & Associates, Inc. of August 1977 and other Board requirements and specifications. According to document prepared by LaRose Contracting Corporation, the total cost of the work amounted to $623,893. Of that amount, $137,000 was paid by others leaving a remaining balance due of $496,893. A second document prepared by La-Rose Contracting Corporation showed the total costs plus profit of the lift station and force main sewer line along Genie Street amounted to $453,-815.48.
After the system was completed, Burk & Associates, Inc. submitted an independent proposal on July 27, 1983, whereby they estimated the cost to install the system amounted to $243,304. This amount represented the initial estimate of $189,634 plus an additional cost of $53,670 due to the increase in size from a six inch to a 10 inch forced main.

. Documents presented at trial indicate that Klees paid L-P $50,000. However, the petition states that Klees paid L-P $71,750.

. Documents introduced at trial indicate that Tedesco paid L-P $3,828. However, the petition indicates that Tedesco paid $2,750.

. Documents presented at trial indicate that L-P never received reimbursement for 1,420 lots. That number was derived by subtracting the number of L-P's own lots, Klees’ lots and Tedes-co's lots from the 1,850 lots the system was designed to accommodate. However, the petition claims that L-P never received compensation for 1,263 lots.

.Various documents and testimony contained in the trial record estimate the loss to L-P at other amounts. However, the plaintiff claimed damage totalling $315,750 in its petition and in its brief to this court.