433 So.2d 268 (1983)
Kathleen Dupre DUSENBERY, Individually and as Natural Tutrix of the Minors, Kimberly Ann Dusenbery and Stephanie Marie Dusenbery
v.
McMORAN EXPLORATION COMPANY, and J.M. Huber Corporation.
No. 82 CA 0680.
Court of Appeal of Louisiana, First Circuit.
May 17, 1983.
Rehearing Denied June 29, 1983.
*269 John Blackwell, New Iberia, for defendant and appellant Hart, Inc.
Grady C. Weeks, Houma, for plaintiff and appellee.
S. Daniel Meeks and Dean Sutherland, New Orleans, for defendant and appellant Burmond Co. and McMoran Exploration Co.
John K. Hill, Jr., Lafayette, for J & L Steel Corp.
E. Phelps Gay, New Orleans, for intervenor, American Ins. Co.
Michael Maginnis, New Orleans, for SJF Corp, EES Oil & Gas Associates, Robert Weinstock, Special Coral 1971 Drilling Venture.
Before PONDER, SAVOIE and CRAIN, JJ.
CRAIN, Judge.
This is an appeal of the judgment of the trial court in favor of plaintiffs and against defendants McMoran Exploration Company and Burmont Company (hereinafter referred to as McMoran/Burmont), and Hart, Inc. (hereinafter referred to as Hart).
This case arises from a wrongful death action brought by Kathleen Dupre Dusenbery, widow of John Dusenbery, on behalf of herself and the two minor children born of the marriage. John Dusenbery was fatally injured on September 5, 1978 as a result of an explosion which occurred while he was working in the section 7 field of Terrebonne Parish on Well B-5D, which was owned by McMoran/Burmont[1] and operated by Pel-Tex Company, Dusenbery's employer.
In his reasons for judgment, the trial judge described the circumstances which resulted in the accident:
"On the date of the fatal incident, Dusenbery, Frank C. Folse, a supervisor, and Sterling Olivier, a production foreman, travelled by boat to the field involved to clear the flow lines on wells numbers B-5 and B-5D.
The process of cleaning the flow lines was termed `pigging' and was carried out every four to five days to prevent the buildup of paraffin residue in the flow lines. This operation is commenced by turning off the pressure from the well and removing a blanking union cap by unscrewing this cap and placing a polyurethane object called a pig into the pipeline. After screwing the blanking union cap back into place and turning the pressure back on, the pig is forced through the pipe to the next adjacent well by the pressure. As the pig travels through the pipeline, it removes built up paraffin residue.
Testimony at trial revealed that Dusenbery had begun the process of pigging Well B-5D, had turned the pressure off, *270 inserted the pig, and had turned the pressure back on. At this point, the exact sequence of events, while not perfectly clear, led to the failure of the pressure system, at which time a blowout or pressure explosion occurred in which Dusenbery was struck in the head by an object or objects propelled by the force of the well pressure escaping through the breaches of the pressure system which resulted in his death shortly thereafter."
After the accident, it was discovered that there had been at least four failures in the pig launcher/flow line system. The blanking union's cap had been blown off, a schedule 40 nipple had fractured, the flow line had broken about 4-5 feet from the pig launcher, and a 1-inch line used to bleed gas from the pig launcher had broken.
The plaintiffs subsequently filed suit seeking recovery from several defendants, among them McMoran/Burmont, Hart, J.M. Huber Corporation, and Jones and Laughlin Steel Corporation (hereinafter referred to as J & L). Third party petitions were filed by McMoran/Burmont and Hart seeking indemnity and/or contribution from J & L and J.M. Huber, as well as from each other.
During the trial, the trial judge dismissed both McMoran/Burmont's and Hart's third party demands against J & L. After trial, judgment was rendered against McMoran/Burmont and Hart, in the amount of $1.25 million dollars. In reaching that decision, the court concluded that the principal, proximate cause of the accident was the failure of the schedule 40 nipple, which was negligently welded into the system in place of a heavier schedule 80 nipple by Hart welders who should have readily known the difference and rejected the schedule 40 nipple. The court also found that McMoran/Burmont as owner of the well was liable in solido with Hart under La.C.C. Arts. 2317 and 2322. As for J.M. Huber Corporation, the manufacturer of the blanking union cap, the court found no liability, reasoning that the cap was not a cause-in-fact of the accident, and further finding that even if it were, J.M. Huber violated no duty to the users.
In addition to appealing the judgment against them, Hart also appeals the dismissal of its third party demand against J & L, and McMoran/Burmont appeals the dismissal of its third party demand against J.M. Huber Corporation.[2]

HART'S ASSIGNMENTS OF ERROR
On appeal, Hart contends that it did not install the schedule 40 nipple. In support of this, Hart relies solely on the testimony of Pete Wiltz, its field supervisor in 1972. Wiltz stated that Hart constructed the pig launchers used in section 7 in 1972. However, he stated that to the best of his knowledge, Hart did not install any double flanges between the christmas tree and the pig launchers, which is where the schedule 40 nipple was located on Well B-5D. He did admit that there were days he was not in the field and did not know whether Well B-5D was hooked up by Hart on one of those days or not. The testimony was undisputed that there were only two contractors in the section 7 field at the time Well B-5D was hooked up in 1972. Of the two, only Hart did any welding. The schedule 40 nipple in question was welded to an extra heavy duty flange which was part of the pig launching system of the well. The trial judge found that Hart welded the schedule 40 nipple into the launching system. We find no manifest error in this holding. Canter v. Koehring Co., 283 So.2d 716 (La.1973).
In the alternative, Hart claims that some unknown third party patched in the flange along with the schedule 40 nipple subsequent to Hart's original installation. The trial judge found that there had been no alteration of the actual launching system since its installation by Hart in 1972. Frank Folse, an employee of Pel-Tex, testified *271 that there had been no alterations to the well since February 1973, when he began work. There was some evidence that a scrubber pot was added later, however this did not require any welding, nor did it require the alteration of the pipe at the site of the schedule 40 nipple. There was only speculation, no evidence, to prove that someone else had altered the original piping. We find no manifest error in the trial judge's conclusion that Hart installed the schedule 40 nipple which failed in this accident. Canter v. Koehring Co., supra.
The trial judge determined that the schedule 40 nipple failed first and consequently was the cause-in-fact of the accident. Hart contends that the blanking union cap failed first. Both the plaintiff and Hart advanced conflicting theories reconstructing the accident. The trial judge found the explanation offered by the plaintiff's expert, Dr. Courtney Busch, a metallurgist, more plausible:
"Much was made to attempt to prove that the blanking union cap failed first which resulted in the subsequent failures. The Court, while impressed with the quantity, though not the quality of this testimony, is forced by the use of its own logic and reason to ascertain that the nipple was the critical part which failed, causing the accident herein.
The testimony of the witnesses was clear that a great deal of weight and pressure rested on this nipple which provided, together with (the) flange, the sole support of the system involved. It was further clear from the testimony of the witnesses that a Schedule 80 Nipple would have been sufficient to hold. Since the Schedule 40 Nipple was vastly underrated for the load bearing task it was expected to perform, and the failure in this case is entirely consistent with such an inadequate use of material, (sic) the Court is left with no other adequate conclusion than that the Schedule 40 Nipple along with the unsupported launching system was at fault."
After a thorough examination of the record, we find no manifest error in these evaluations of the trial judge. Canter v. Koehring Co., supra.
Next, Hart argues that the inclusion of the schedule 40 nipple was not negligence, claiming that the heavier schedule 80 nipple called for would have also failed under the same conditions.
It is clear that Hart was fully aware that only schedule 80 nipples were to be used in the launching system. It was the opinion of the trial judge, based on the testimony of Dr. Busch, and others, that a schedule 80 nipple would have held even under the added pressure, and also added weight due to the addition of the scrubber pot which was apparently installed by an unknown party after installation of the launcher system. The trial judge consequently found Hart was negligent in welding an inadequate schedule 40 nipple into the launching system, in view of the fact established by testimony from almost every witness that any competent welder would have known the difference in the two nipples and discarded the schedule 40. We find no manifest error in these findings of fact, Canter v. Koehring, Co., supra.
Hart's contention that the trial court erred in granting J & L's motion for dismissal of Hart's third party demand against it, also lacks merit. We agree with the finding that no negligence was shown on J & L's part. In order for J & L to be found negligent, it was necessary that Hart prove that J & L mistakenly supplied the schedule 40 nipples in question. This, Hart failed to do. Hart relied on the fact that schedule 80 nipples were brought in sacks from J & L for this particular job, and from that concluded that since a schedule 40 nipple was used, J & L must have placed at least one schedule 40 nipple in the sacks of schedule 80 nipples. Certainly that is one conclusion that could be reached. However, it is only speculation. There is another explanation for the presence of the schedule 40 nipple at least equally as plausible.
Oren Francois, a Pel-Tex employee, was to acquire parts for the job from J & L's store, where Pel-Tex had established a line of credit. J & L did fill an order for *272 schedule 80 parts for this job, however, another supply company, not a party to this suit, had also filled orders for schedule 40 parts for Pel-Tex to be used on the well. There was testimony that indicated that both schedule 40 and schedule 80 parts were stored in the same place. Pete Wiltz, Hart's field supervisor testified:
"Q. You said the flow lines were Schedule 40?
A. Yes, sir.
Q. Of course, you have got to have some connections to connect up those flow lines?
A. That's right.
Q. And so you had that material out on theat the various areas where you were working?
A. Right.

* * * * * *
Q. When you all worked out there on whatever it might be, the cribbing, platforms, you had a barge which went from location to location?
A. Yes, sir.
Q. And the barge has a doghouse on it or a dog shack or whatever you
A. No, sir, it was just all on the deck.
Q. But at any rate you kept your materialsyour lines, your nipples and connections, just generally stored on or about the barge or the cribbing that you were working on?
A. Yes, sir.
Q. I believe you told me in your deposition that the nipple that's welded to the flange in `Dusenbery 10,' is something that to your knowledge would have been threaded in the field or cut
A. It would have probably been threaded and then cut.
Q. In the field?
A. In the field.
Q. That's simply because you don't know any nipples of this size that you see in this flange that were readily available on the market off the rack, so to speak?
A. That's correct.
Q. And, of course, your Hart crew had the capability in the field to thread and bevel, as well as weld?
A. That's correct."
Apparently, having the two sets of parts in close proximity should not have presented a problem to Hart welders, since every witness who testified said that any competent welder would readily know the difference in the two nipples by sight and feel.
We therefore find that Hart did not prove negligence on J & L's part by a preponderance of the evidence and the trial judge was correct in dismissing J & L from this suit.
Since we find no error in the trial judge's conclusions that the failure of the schedule 40 nipple was the cause of the accident and that the blanking union cap blew off as a result, there is no need to discuss Hart's contention that J.M. Huber violated any alleged duty to warn of the dangers of excessive wear on the blanking union cap it manufactured.
Appellant Hart also takes the position that the trial court erred in not allowing it to introduce the deposition of Stephen Killingsworth, J & L's expert witness. Killingsworth had been in court during the first few days of the trial and left when J & L was dismissed at the close of the plaintiff's case. Without deciding the admissibility of the deposition, we have reviewed the deposition which was proffered into evidence and do not find that it affects our conclusion in this case. cf. Lee v. State Farm Automobile Insurance Co., 144 So.2d 408 (La.App. 1st Cir.1962).

McMORAN/BURMONT'S ASSIGNMENTS OF ERROR
In its first assignment of error, McMoran/Burmont argues that the trial court erred in failing to find it to be the "statutory employer" of John Dusenbery, and thus, *273 immune from tort liability pursuant to La. R.S. 23:1032 and 23:1061.[3]
The court in Vincent v. Ryder Enterprises, 352 So.2d 1061 (La.App. 3rd Cir.1977), set out four requirements for classification as a statutory employer:
"(1) The relationship of principal-contractor (as distinguished from another type of relationship, i.e., vendor-vendee) must exist.
(2) There must be a contract between the principal and contractor for the execution by the contractor of the whole or any part of work being undertaken by the principal.
(3) The `work' which is the subject of the contract must be part of the principal's trade, business or occupation.
(4) The injured employee must be engaged in the execution of the `work' as described above." 352 So.2d at pg. 1068, 1069.
The trial court felt that McMoran/Burmont did not meet requirement (3), reasoning that McMoran/Burmont is an investment entity whose principal business activity is one of ownership. We agree.
McMoran Exploration Company and Burmont Company each owned 50% interest in the mineral leases of the section 7 field of Terrebonne Parish. Although there is no evidence of a written contract between them, apparently Burmont Company, who was designated "operator" in McMoran/Burmont's operating agreement, delegated actual operation of the field to Pel-Tex Oil Company. Pel-Tex provided all maintenance services in the field, including "pigging the wells". The appellant seeks to compare itself to oil companies who routinely contract out various types of work to third party contractors, which work is part of the trade, business and occupation of oil producers and refineries, and could be done by their own employees. Traylor v. Shell Oil Company, 400 So.2d 342 (La.App. 4th Cir.1981), writ denied, 405 So.2d 530, (La. 1981). McMoran/Burmont is not an oil company, but an entity whose trade, business, and occupation is solely that of investment in mineral leases, ownership of wells produced on those leases, and the sale of oil and gas from those wells. McMoran/Burmont has no employees. Determination of whether a principal is a statutory employer against which workmen's compensation is an exclusive remedy must be handled on a case-by-case basis. Boudreaux v. Boudreaux, 369 So.2d 1117 (La.App. 1st Cir. 1979) writ denied 371 So.2d 615, (La.1979). We find that maintenance of oil platforms is not part of McMoran/Burmont's trade, business and occupation. Therefore, the trial judge correctly denied the defense of *274 "statutory employer" to McMoran/Burmont.
McMoran/Burmont next argues that the issue of strict liability under La.C.C. Arts. 2317 and 2322[4] was not raised by the pleadings and since they objected at the trial to all evidence which would have expanded the pleadings, the plaintiffs should be limited to their original claims. We disagree, and adopt the rationale of the trial judge that:
"It is obvious herein that as owner of a defective thing which can also be likened and has been likened in the jurisprudence to a building, McMoran/Burmont in analyzing its posture in this case could not possibly have approached the impending trial in this matter without understanding that these two bases of recovery had to be heavily relied upon by the plaintiff. Taking this one step further, the Court must question whether or not McMoran/Burmont was prejudiced by the failure of the plaintiff to specifically state these allegations in its petition and whether or not this is such a construction to the pleadings as to do substantial justice to the parties. In analyzing the record in this matter, the Court must answer the first question in the negative, and the second question in the affirmative. The record in this case will indicate that McMoran/Burmont was fully apprised of all of the factual issues (sic) involved. Since the facts determine which law is applicable even a rudimentary review of the facts in this case shows that McMoran/Burmont and any liability it might suffer would almost surely have to come under Civil Code Article 2317 and/or Civil Code Article 2322."
Our review of the record reveals that plaintiff's pleadings set forth a claim against McMoran/Burmont for ownership of a well defective in design and construction. This is sufficient for the introduction of evidence of liability under La.C.C. Arts. 2317 and 2322.
McMoran/Burmont questions the application to them of La.C.C. Arts. 2317 and 2322. The strict liability imposed by La.C.C. Art. 2317 is clearly applicable. McMoran/Burmont owned Well B-5D, and had custody stemming from such ownership. The well was defective in design and construction. They are liable for damages resulting from such defect under Loescher v. Parr, 324 So.2d 441 (La.1975), and its progeny.[5]
Neither do any of the defenses apply which would absolve McMoran/Burmont from strict liability. Appellant argues fault of a third person, Hart. A similar argument under like circumstances was disposed of in Olsen v. Shell Oil Co., 365 So.2d 1285 (La.1978) where the Court said at pages 1293-1294:
"The fault of a `third person' which exonerates a person from his own obligation importing strict liability as imposed by Articles 2317, 2321, and 2322 is that which is the sole cause of the damage, of the nature of an irresistible and unforeseeable occurrencei.e. where the damage resulting has no causal relationship whatsoever to the fault of the owner in failing to keep his building in repair, and *275 where the `third person' is a stranger rather than a person acting with the consent of the owner in the performance of the owner's non-delegable duty to keep his building in repair."
Therefore, Hart's fault is not intervening fault which would relieve McMoran/Burmont under La.C.C. Art. 2317.
It is not necessary for us to discuss appellant's claim for indemnity from J.M. Huber Corporation since we agree with the trial judge that the blanking union cap manufactured by J.M. Huber was not a cause-in-fact of the accident.

INDEMNITY
Both McMoran/Burmont and Hart claim indemnity from each other. Hart predicates its claim for recovery on the theory, already dismissed by this court, that the schedule 40 nipple was adequate and that the placement of the scrubber pot added the weight which ultimately caused the accident. Hart claims that McMoran/Burmont, as owner, is legally responsible for the defective design of the pig launcher. We have already determined that Hart was actively negligent in installing the schedule 40 nipple; consequently, Hart is not entitled to claim indemnity on any theory.
McMoran/Burmont claims that it is entitled to indemnity from Hart, arguing that any liability on the part of McMoran/Burmont would be technical, constructive, vicarious and derivative as owner of the well site. Several cases are cited in its brief which hold that parties not actually at fault, whose liability stems from the fault of others, may recover by way of indemnity from such others. Appalachian Corporation v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922), Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967). McMoran/Burmont submits that if Hart is found to be negligent and therefore, actively at fault, it is entitled to indemnification from Hart.
We have determined there is liability on the part of McMoran/Burmont at least under La.C.C. Art. 2317. The liability imposed by this article is based upon custody of the defective thing which in this case was designed and constructed defectively. It had been in place some six years prior to the accident, and was owned during this entire period by McMoran/Burmont. The liability is not vicarious. Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982). Just as Hart's negligence was not an intervening cause which would relieve McMoran/Burmont from strict liability under C.C. Art. 2317, neither does it relieve them from joint responsibility for the damages incurred here.

DAMAGES
Finally, both McMoran/Burmont and Hart object to the trial judge's award of $1.25 million dollars for "loss of support, love, affection, companionship and society" as excessive and abuse of discretion. The trial judge considered the fact that John Dusenbery was only twenty-three years old at the time of his death; he was married and had a child; a second child was born the month after his death. Testimony indicated that the family was very close. Additionally, the evidence at trial established that between Mr. Dusenbery's death and the date of trial, the salary of workers in similar positions rose from five dollars per hour to ten dollars per hour, with a proportionate increase in fringe benefits. Based on that evidence, Dr. Melville Wolfeson, an expert economist, calculated what he considered to be a conservative estimation of $1,492,128.00 for loss of support alone. The trial judge is granted wide discretion in determining the quantum of damages, Boswell v. Roy O. Martin Lumber Co., 363 So.2d 506 (La.1978). We believe the facts and circumstances of this case warranted the amount of damages awarded, and therefore, find no abuse of discretion on the trial judge's part.
For the foregoing reasons we affirm the judgment of the trial court. All costs of this appeal are to be shared equally by the appellants.
AFFIRMED.
NOTES
[1] McMoran Exploration Company and Burmont Company each owned 50% of the mineral leases in the section 7 field. On June 17, 1971, they entered into an operating agreement in which they agreed to develop these leases as McMoran/Burmont. This partnership/joint venture, the classification is immaterial, has only one identity in this litigation and therefore, for the sake of brevity is referred to in this appeal as it was in the trial judge's reasons for judgment, as McMoran/Burmont.
[2] In an earlier opinion, Dusenbery v. McMoran Exploration Co., 425 So.2d 249 (La.App. 1st Cir.1982), this court held that because McMoran/Burmont agreed to the dismissal of its claim against J & L without prejudice, that judgment is not appealable. Therefore, only Hart's appeal from the dismissal of its third party demand against J & L is before this court.
[3] La.R.S. 23:1032 and 23:1061 read in pertinent part:

"Section 1032: Exclusiveness of rights and remedies; employers' liability to prosecution under other laws. The rights and remedies herein granted to an employee or his dependent on account of an injury, or compensable sickness or disease for which he is entitled to compensation under this Chapter, shall be exclusive of all other rights and remedies of such employee, his personal representatives, dependents or relations, against his employer, or any principal or any officer, director, stockholder, partner or employee of such employer or principal, for said injury, or compensable sickness or disease. For purposes of this Section, the word `principal' shall be defined as any person who undertakes to execute any work which is a part of his trade, business or occupation in which he was engaged at the time of the injury, or which he had contracted to perform and contracts with any person for the execution thereof..."
"Section 1061. Principal contractors; liability. Where any person (in this section referred to as principal) undertakes to execute any work, which is a part of his trade, business or occupation or which he had contracted to perform, and contracts with any person (in this section referred to as contractor) for the execution by or under the contractor of the whole or any part of the work undertaken by the principal, the principal shall be liable to pay to any employee employed in the execution of the work or to his dependent, any compensation under this Chapter which he would have been liable to pay if the employee had been immediately employed by him; and where compensation is claimed from, or proceedings are taken against, the principal, then, in the application of this Chapter reference to the principal shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the employer by whom he is immediately employed..."
[4] La.C.C. Arts. 2317 and 2322:

"Art. 2317
We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of things which we have in our custody. This, however, is to be understood with the following modifications."
"Art. 2322
The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
[5] In Kent v. Gulf States Utilities Co., 418 So.2d 493 (La.1982), the Court discussed La.C.C. Art. 2317 strict liability at page 497:

"Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in custody, and the owner accordingly will be held liable for failing to take steps to prevent injury resulting because the thing in his custody presented an unreasonable risk of injury to another."