**FIRST NATIONAL BANK OF
JEFFERSON PARISH**

v.

**FIRST MARYLAND LEASECORP.**

Civ. A. No. 83–2785.

United States District Court,
E.D. Louisiana.

April 4, 1984.

Robert A. Redwine, New Orleans, La., for plaintiff.

Philip K. Jones, Jr., New Orleans, La., for defendant.

FINDINGS OF FACT AND
CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

*Findings of Fact*

1. Plaintiff, First National Bank of Jefferson Parish (hereinafter FNJ), is a Louisiana corporation.

2. Defendant, First Maryland Leasecorp (hereinafter FML), is a Maryland corporation doing business in Louisiana, properly registered.

3. Brendomar Shipping, Inc. (hereinafter Brendomar), is a Louisiana corporation.

4. M/V PERSISTENCE is a tugboat owned by Persistence Towing Co., Inc., a subsidiary of Brendomar.

5. M/V PERSERVERENCE is a tugboat owned by Perserverence Towing Co., Inc., also a subsidiary of Brendomar.

6. In the spring of 1982, the Brendomar companies were making payments to FML on two outstanding loans of $1,800,000 each on PERSISTENCE and PERSERVERENCE. The loans were secured by first mortgages on the respective vessels.

7. Also in the spring of 1982, the Brendomar companies were making payments on a balance between $350,000 and $375,000 on a $500,000 line of credit from FNJ. This line of credit for the operation of the vessels was secured by an assignment of accounts receivable.

8. FNJ had also lent two "working capital injections" of about $65,000 a piece to Frank P. Haendler and to a Mr. Bossetta, who were then the operators of the Brendomar companies. These "working capital injections" were secured by second mortgages on the homes of the two men.

9. FNJ had also agreed to finance the payment of premiums on several insurance policies on the two vessels issued by certain Underwriters at Lloyd's of London. Under this agreement, Brendomar had prepaid part of the total premium, FNJ financing the balance over eleven months, and taking promissory notes dated April 19, 1982, of $60,733.38 and $60,193.97, respectively. FNJ as lender had the right to cancel the policies and collect the return premiums upon default. The insurance financing was secured by third mortgages on PERSISTENCE and PERSERVERENCE.

10. The three FNJ–Brendomar financing arrangements were "cross-collateralized;" thus, the property listed as security for any of the loans was also security for any other of the loans.

11. In May of 1982, J. Stratton Orr, vice president in charge of the Brendomar accounts, left his position at FNJ. John Boyd, also a vice president, took responsibility for the accounts. By that time, market conditions had seriously diminished Brendomar accounts receivable, and FNJ was not willing to make further advances on accounts receivable security. Brendomar also became delinquent on the line of credit. Soon after taking over the accounts, Boyd had what he described as "very candid discussions" with officers of Brendomar. The company was unable to get outside financing, as the vessels were heavily mortgaged and so many of the receivables were more than ninety days overdue. Boyd learned that the FML loans were delinquent as well.

12. Boyd initiated contacts with Michael Pyles, vice president in charge of the Brendomar accounts at FML, in early June, and maintained periodic contact with him in the ensuing months. Each was unable to persuade the other to make further advances to Brendomar.

13. Although the insurance financing was the last FNJ Brendomar loan to become delinquent, the prospect was clear by June 1, and, in fact, the June and July payments were not made.

14. In a telephone conversation on or about July 6, Boyd told Pyles that FNJ was planning a cancellation of the Lloyd's policies in order to collect the return premiums. Pyles objected, and, after further discussion, Boyd ended the conversation with the impression that Pyles had agreed to reimburse FNJ for keeping the policies current. FNJ did not cancel the policies in the several weeks following the conversation.

15. On July 23, 1982, FML filed a complaint against Brendomar in the U.S. District Court, Eastern District of Louisiana, and asked for seizure of PERSISTENCE and PERSERVERENCE.

16. On July 26, 1982, Brendomar filed a voluntary Chapter 11 petition in the U.S. Bankruptcy Court, Eastern District of Louisiana.

17. In the few days following the bankruptcy filing, a creditors' meeting was convened at the bankruptcy court. Speaking with Pyles in the lobby, Boyd asked when FML was going to "get straight" with FNJ on the insurance financing. Pyles replied that he had not understood the early July telephone conversation to be an agreement. FML, in his opinion, had not been committed to take any action relative to the policies. An ensuing argument did not resolve the disagreement.

18. As of the trial date, FNJ has been unable to collect the return premiums due to a dispute with the insurers not related to these proceedings.

19. The return premiums decreased by $192.96 and $191.26 per day, respectively, in the period following the proposed cancellation. Interest accrued on the insurance financing itself at $27.71 and $27.47 per day, respectively.

20. FNJ has claimed the above daily amounts as damages, for losses arising out of deferring cancellation from July, 1982, due to the alleged representations by Pyles.

*Conclusions of Law*

1. This court has jurisdiction based on diversity of citizenship.

2. Louisiana law determines the existence of any contract in this matter and the effect of any alleged representations by FML.

3. The conflicting direct evidence is insufficient to prove an oral contract.

4. An oral contract may be proven by circumstantial evidence. For example, in *Lanier v. Alenco*, 459 F.2d 689, 692 (5th Cir.1972), an oral contract of employment was inferred when the plaintiff had left his former well-paying job to assume his new position.

5. The circumstantial evidence in this matter is not clearly convincing. It indicates that during the relevant period, FNJ's third mortgage on the vessels was not a strong security, as the first two mortgages equalled or surpassed the insurance value. Thus, cancellation of the policies for the return premiums appeared the most likely means of recovering amounts due on the insurance financing. Second, FML had an interest in maintaining the policies in effect, as the vessels were at sea in early July, increasing the difficulty of FML obtaining insurance. On the other hand, the receivables generated by the continued operation of the vessels, however meager, represented the best hope of avoiding the bankruptcy of Brendomar. Thus, FNJ had at least a colorable interest in continuing the policies. The conclusion that only a contract would have led Boyd to delay cancellation is not inescapable. Moreover, even if the evidence squarely indicated the best interests of FNJ to lie in immediate cancellation, the delay could have been based on a misunderstanding rather than an agreement. Boyd's contention that he understood Pyles to make the alleged representation is not incredible. Boyd's understanding, however—in direct conflict with Pyles' testimony—does not prove that Pyles actually made the alleged representation.

6. Plaintiff contends that the silent acceptance of benefits by defendant raises a presumption as to the existence of a contract, citing Louisiana Civil Code Article 1816. FML's "acceptance" of continued insurance coverage on the vessels, however, was not the sort which would, logically speaking, only occur if a contract existed. FML accepted the benefits in the same sense that all creditors accepted the benefits of continued coverage, rather than in the sense, for example, of a merchant accepting a delivery of goods. FML's knowl-

edge of FNJ's plan to cancel the policies does not, alone, alter this conclusion.

7. Plaintiff argues that FML was unjustly enriched, citing *Minyard v. Curtis Products, Inc.*, 251 La. 624, 205 So.2d 422 (1967). A cause for unjust enrichment, also styled *actio de in rem verso*, requires proof of five elements: an enrichment, an impoverishment, a connection between the enrichment and the impoverishment, an absence of justification or cause, and lack of adequate remedy at law. *Minyard, supra*, 205 So.2d at 432. Absent proof of the alleged representation by Pyles, the required connexity, as well as the required absence of justification, are not shown.

8. Similarly, the general claim of detrimental reliance must fail where the representation by Pyles has not been proved.

9. Plaintiff has failed in its burden of proof of showing any basis for holding defendant liable.

Counsel for defendant will submit a judgment consistent with these findings.