**Gerd L. OPPENHEIM**

v.

**CUTE TOGS OF NEW ORLEANS, INC., Frank J. McGill, Individually and as President of Cute Togs of New Orleans, Inc., and/or Normac Company, Inc., and/or F.J. McGill Company, Inc.**

Civ. A. No. 83–5826.

United States District Court, E.D. Louisiana.

March 31, 1986.

**19.** *Reiss v. Pan American World Airways, Inc.,*    711 F.2d 11, 14 (2d Cir.1983).

**1266**

James A. McCann, McCann & McCann, New Orleans, La., for plaintiff.

Mary Ann Coffey, Halpern, Holden & Daigle, Metairie, La., for defendant.

## REASONS FOR JUDGMENT

LIVAUDAIS, District Judge.

Plaintiff, Gerd L. Oppenheim ("Gerd"), sues Cute Togs of New Orleans, Inc. ("Cute Togs"), Frank J. McGill ("McGill"), Normac Company, Inc. ("Normac"), and F.J. McGill Company, Inc. ("McGill Co."), to recover a $50,000 loan which he allegedly made to Cute Togs, for past vacation benefits, and for attorney's fees under L.S.A.–R.S. 23:632. Defendant McGill filed several counterclaims against plaintiff alleging securities fraud, but he withdrew these claims prior to trial. Defendant McGill has filed a third-party action against Fred Jellin ("Jellin") and Henry Oppenheim ("Henry") who were previous owners of Cute Togs, alleging that they agreed to hold the defendants harmless in the stock purchase agreement which transferred ownership of the stock in Cute Togs to McGill. The third-party defendants have filed a counterclaim against defendant McGill, alleging that the third-party demand has caused them mental anguish. The matter was tried to the Court sitting without a jury. Jurisdiction is based on diversity, 28 U.S.C. § 1332. Louisiana law is applicable to this controversy.

Plaintiff Gerd was an employee of Cute Togs, a company which manufactures children's clothing, from 1957 through 1965, and from 1970 through September 1983, when he was discharged from his employment. Prior to May 3, 1982, Cute Togs was owned and operated by Henry, plaintiff's brother, and Jellin. The company was having serious financial difficulties in 1982 and in several previous years. In an effort to prevent the business from collapsing, both Jellin and Henry invested thousands of dollars in Cute Togs. Henry had put approximately $240,000 and Jellin approximately $60,000 into the company. Plaintiff Exhibit 6. In return for this considerable investment, Henry and Jellin received stock in the corporation and were the sole shareholders of Cute Togs shares at the time of the transfer of ownership. Plaintiff Exhibit 6.

Gerd was acutely aware of the dire financial straits of Cute Togs, both because he was an employee and because his brother was a large equity owner. In an effort to keep the business intact and to help his brother, Gerd offered to "put some money into" Cute Togs. On March 6, 1981, a check written to Cute Togs on the joint account of Gerd and Trudy, his wife, at Colonial Bank in the amount of $30,000 was deposited into Cute Togs' account. Plaintiff Exhibit 4, pp. 5, 6–7. On March 23, 1981, a $20,000 check from Gerd and Trudy Oppenheim was deposited in Cute Togs' account. Plaintiff Exhibit 4, pp. 1, 3–4. The funds are reflected in the cash receipts ledger of Cute Togs, with $30,000 being credited to the General Account on March 6, 1981 and $20,000 credited to the General Account on March 23, 1981. Defendant Exhibit 17. The specific account number of the ledger account in which the $50,000 was credited was numbered 300. Account number 300 is entitled "private ledger" and it was in this account that all investments by Henry and Jellin, then the owners of Cute Togs, were credited. The notation "per private leger [sic], account # 300 Fred Jellin J.S." is printed next to the $30,000 credit to the "private ledger" account # 300, dated March 31, 1981. The notation "per private ledger account # 300 Gerd Oppenheim J.S." Defendant Exhibit 17. The initials "G.O." are printed next to the $20,000 credit to the "private ledger" account # 300, dated March 30, 1981.

Both of the previous owners of Cute Togs, Henry Oppenheim and Fred Jellin, testified that Gerd did "put $50,000" into Cute Togs. This is corroborated by the entries on the cash receipts journal and the private ledger. The bookkeeper's notation of "F.J." and "Fred Jellin" next to the

$50,000 deposit are erroneous as a $30,000 check from Gerd was deposited into Cute Togs account in March, 1981. Plaintiff Exhibit 4, pp. 5, 6–7. The $20,000 deposit is correctly noted as being from "Gerd Oppenheim" and "G.O." Gerd did not receive any stock in Cute Togs at this time or prior to the sale of the stock to Normac on May 3, 1982. Henry testified that he and Jellin had discussed giving Gerd some stock in the business, but they never did while they owned the company. The plaintiff and his wife, Trudy Oppenheim, obtained the funds they put into Cute Togs by taking out a $50,000 loan at Colonial Bank on February 16, 1981, which loan was secured by property located at 316–318 Stafford Place, New Orleans, Louisiana. Plaintiff Exhibits 1–A, 2, 3.

Sometime after March, 1981 and before May, 1982, McGill and Gerd discussed the possibility of Normac purchasing Cute Togs. McGill and Gerd were prior acquaintances and McGill had expressed some interest in purchasing Cute Togs. McGill owned an interest in three clothing manufacturing businesses in Mississippi. He visited the Cute Togs plant and believed that an infusion of capital could turn the company into a viable venture. Both parties testified that Gerd, at this point, told McGill that he had "put $50,000 into" Cute Togs.

Dudley Yoedicke, the attorney for Cute Togs, was asked by Henry and Jellin to draw up a proposal for the sale of Cute Togs to McGill. This first draft proposal is contained in an April 15, 1982 letter by Yoedicke to Mr. Silva of the law firm of Talamo, Phillips, Silva & Talmus, the attorney for McGill. Plaintiff Exhibit 6. The attachment to the Yoedicke letter includes the following as a proposal:

Execution of promissory notes by the stock purchaser to cover the following obligations:

| | |
|---|---|
| Henry Oppenheim ............ | $240,000.00 |
| Fred Jellin .................. | $ 60,000.00 |
| G. Oppenheim ............... | $ 50,000.00 |
| Hertha Oppenheim ........... | $ 75,000.00 |

The notes to G. Oppenheim and Hertha Oppenheim are not for the stock, but are for money loaned to the corporation. I understand that the final note amount and time of payment is still in negotiation.

Plaintiff Exhibit 6.

The obligation to Hertha Oppenheim was for a $75,000 loan by Hertha Oppenheim, who is Henry and Gerd's mother, which she secured by placing a mortgage on her home. She received no stock in Cute Togs for this loan.

The final agreement between Henry, Jellin and McGill is represented in a document entitled "Stock Purchase Agreement" dated May 3, 1982. Henry and Jellin transferred all of the shares of Cute Togs to Normac, Inc. pursuant to this agreement. At the time the agreement was consummated, Yoedicke, McGill and Jellin attended a meeting. Yoedicke testified that he specifically asked McGill and Jellin what the arrangements were regarding Cute Togs' indebtedness to Gerd and was told that that was being handled through a separate agreement. The Stock Purchase Agreement itself was signed without the amendments or attachment having been prepared on May 3, 1982. Plaintiff Exhibit 9. Amendment No. 1 to the Stock Purchase Agreement dealing with the Sellers' payment of accrued taxes was signed on July 2, 1982. Plaintiff Exhibit 10. Amendment No. 2 to the Stock Purchase Agreement amending the number of shares transferred, along with other portions of the Stock Purchase Agreement, was signed in March, 1983. Plaintiff Exhibit 21 and Defendant Exhibit 3. None of the documents evidencing the transfer of stock, including the stock purchase agreement and attachments and the two amendments, make provision for Gerd's $50,000 or the $75,000 loan made by Hertha Oppenheim. The principals, Henry and Jellin, did not receive a large cash payment as consideration for the sale, but were relieved of most of the debts of Cute Togs. After Normac acquired the Cute Togs' stock, the shares were then transferred from Normac to McGill individually. Defendant Exhibit 13.

After the sale of Cute Togs in May, 1982, Gerd continued to work for the corporation. Cute Togs began to pay the installment interest payments on Gerd's loan to Colonial Bank. Both parties testified that Gerd and McGill discussed the $50,000 that Gerd "put into" the company. Gerd stated that he discussed receiving a "percentage" of the company for the $50,000, but that he did not agree to accept 20 shares of stock. McGill stated that he gave Gerd 20 shares of stock, which represented 10% of the company as there were 200 authorized shares. McGill said that he intended to invest an additional $500,000 into Cute Togs; that he determined that 10 percent of that was $50,000, which was what Gerd invested.

On January 3, 1983, a stock certificate, representing 20 shares of no par value common stock in Cute Togs, was issued to Gerd Oppenheim. Plaintiff Exhibit 12. A Cute Togs corporate resolution dated March 3, 1983 and signed by three corporate officers authorizes and directs the corporation "to issue to Gerd Oppenheim 15 shares of common stock, no par value, of the corporation at a price of $1.00 per share, all of which shall be allocated to stated capital." Plaintiff Exhibit 11, p. 00717. Amendment No. 2 to the Stock Purchase Agreement reflects that there were 200 shares of common stock authorized, but only 150 of these authorized shares were actually issued. Defendant Exhibit 3 and Plaintiff Exhibit 21. Fifteen shares would thus equal 10% of the shares that are both authorized and issued. The plaintiff conceded that he did not give any money to the corporation for the stock at the time it was received.

On September 26, 1983, the plaintiff was discharged from his employment with Cute Togs. On the date of his termination, he wrote a letter to the corporation requesting "payment of all sums due me including but not limited to salary, both for this last week and for the six months during which I received no payment under my employment agreement, together with the two week vacation benefits due me for each of the years 1981, 1982 and 1983." Plaintiff Exhibit 23. At trial, plaintiff's only demand regarding pay or benefits was for two weeks of vacation pay for the year 1983. No manual or written document existed which explicitly stated the Cute Togs' policy regarding vacation pay either before or after the sale to McGill. Three longtime employees, two of whom had 30 years and one who had 14 years with Cute Togs, testified that before the transfer, they received either time off or two weeks pay as vacation benefits, but they understood that the company's policy regarding vacation pay had changed when McGill took over management. No evidence of any type of specific employment agreement dealing with vacation pay or benefits between McGill and Gerd was introduced at trial.

The basis of the third-party complaint is Section VI of the Stock Purchase Agreement entitled "Indemnification and Offset" which provides, in pertinent part:

Sellers jointly and severally, with the intention of being bound in solido, agree to indemnify and hold harmless Buyer, its successors and assigns, against and in respect of all Damages (as hereinafter defined). Damages, as used herein, shall include any claim, action, demand, loss, injury, cost, expense, liability (joint, several or solidary), penalty or other damage, including, without limitation, counsel fees and other costs and expenses incurred in investigating and attempting to avoid the same or oppose the imposition thereof or in enforcing this indemnity, resulting to the Buyer, its successors or assigns, from (a) any inaccurate representation made by or on behalf of any Seller in this Agreement or any certificate or other document delivered pursuant hereto, ...

Defendant Exhibit 1, p. 9. Defendants McGill and Normac claim that sellers Henry and Jellin failed to list the liability of Gerd's as a debt in the agreement; that this constitutes an inaccurate representation; that this case ensued, and that the Sellers are therefore liable to the defendants for costs and attorney's fees.

## THE LOAN CLAIM

■ Since there are no writings to memorialize the intent of the parties, the Court must ascertain what the oral contract regarding the $50,000 was by the testimony and by circumstantial evidence. An oral contract may be proven by circumstantial evidence. *First National Bank of Jefferson Parish v. First Maryland Leasecorp,* 582 F.Supp. 853, 855 (E.D.La.1984); *Lanier v. Alenco,* 459 F.2d 689, 692 (5th Cir.1972). The manner of proving the existence and terms of a contract not reduced to writing is set forth in Article 2277 of the Civil Code which provides:

All agreements relative to movable property, and all contracts for the payment, where the value does not exceed five hundred dollars, which are not reduced to writing, may be proved by any other competent evidence; such contracts or agreements, above five hundred dollars in value, must be proved by at least one credible witness, and other corroborating circumstances.

L.S.A.–C.C. art. 2277.[1] *B.M. Albrecht Electric, Inc. v. Griffin,* 413 So.2d 246, 247 (La.App. 4th Cir.1982).

A party claiming execution of a contract, and payment or exoneration, must prove the facts necessary to support the claim in accordance with Article 2232 of the Louisiana Civil Code. Article 2232 provides:

He who claims the execution of an obligation must prove it.

On the other hand, he who contends that he is exonerated, must prove the payment or the fact which has produced the extinction of the obligation.

L.S.A.–C.C. art. 2232.[2]

■ Under Louisiana law, the plaintiff or the party demanding performance bears the burden of proof, that is, must prove, viewing the evidence as a whole, the exist-ence of a fact is more probable than its nonexistence. *Bordlee v. Pat's Construction Co., Inc.,* 316 So.2d 16, 17 (La.App. 4th Cir.1975); *Lombard v. Sewerage & Water Board of New Orleans,* 284 So.2d 905 (La. 1973).

■ With respect to the main demand that Cute Togs has a debt of $50,000 to plaintiff Gerd, the Court finds that at the time Cute Togs received the funds and at the time of the sale of stock, Cute Togs did have a debt of $50,000 to Gerd. However, that debt was extinguished by the issuance of 20 shares of stock, which was 10% of the company, to Gerd because that was the agreement reached by Gerd and McGill for payment of the loan.

Despite defendant's protestations that there is no evidence to establish the existence of the original loan, the testimony of Dudley Yoedicke, a disinterested witness, Henry, Jellin and the plaintiff, as well as the bookkeeping entries in the journal and ledger, the plaintiff's loan documents and cancelled checks, and the first draft of the stock sale documents prove conclusively that Gerd did "put $50,000 into" Cute Togs. The fact that there are no documents to show that Gerd received stock prior to the sale of the company and that the documents that do exist, i.e., the Stock Purchase Agreement and Amendments, indicate that he was not a stockholder establishes that the $50,000 was a loan and not an equity investment up to the time of the sale of the stock.

Defendants have established by a preponderance of the evidence that Gerd and McGill reached an agreement that Gerd would receive an ownership interest of 10 percent of the company in satisfaction of the debt. The plaintiff himself testified that he and McGill had discussed his receiv-

---

1. This article was vacated by the amendment and reenactment of Titles III and IV of Book III of the Civil Code of 1870, which formerly contained C.C. arts. 1756 to 2291, by Acts 1984, No. 331 to certain C.C. arts. 1756 to 2057, effective January 1, 1985. Article 1846 reproduces the substance of C.C. art. 2277 (1870) and does not change the law.

2. This article was vacated by the amendment and reenactment of Titles III and IV of Book III of the Civil Code of 1870, which formerly contained C.C. arts. 1756 to 2291, by Acts 1984, No. 331 to contain C.C. arts. 1756 to 2057 effective January 1, 1985. Article 1831 reproduces the substance of C.C. art. 2232 (1870) and does not change the law.

ing a "percentage" of the business as compensation for the debt. At the time the sale of Cute Togs' stock was being consummated, Yoedicke, Henry and Jellin's attorney, upon inquiry into the matter, was told by McGill that Gerd's debt would be taken care of by a separate agreement McGill had with Gerd. Cute Togs issued a stock certificate for 20 shares of Cute Togs' stock, which was 10 percent of the 200 authorized shares. The corporate resolution incorrectly reflects that the plaintiff was issued 15 shares of stock, which coincidentally equals 10 percent of the 150 issued shares, but this only supports the likelihood that Gerd agreed to accept 10 percent of the company in repayment for the loan.

Plaintiff argues that because the company was in such dire financial straits, it is unlikely that he would have made such an agreement. The precise reason why Gerd agreed to the arrangement is of course unknown, but there are several reasons why he might have done so. Gerd continued to be employed by Cute Togs and after the sale of the stock to Normac and then to McGill, he expected that there would be a new infusion of capital along with new management. Gerd may have believed that the value of the stock would improve and that the return on his investment, if it were stock in the company, might be substantial and more likely than payment of an unsecured debt on which no interest was agreed upon owed by a corporation with many debts. Gerd had a friendly relationship with McGill prior to the sale of the company and it was he who brought McGill and the sellers together initially and after a breakdown of negotiations. The plaintiff's agreement with McGill, not an agreement to purchase stock, but an agreement to accept the stock as payment or extinction of the debt, for whatever reason he chose to make it, is corroborated by McGill's testimony as well as the surrounding circumstances and documents. Plaintiff's claim for payment of a $50,000 debt should be dismissed.

### THE VACATION PAY CLAIM

■ Plaintiff produced no evidence, other than his own testimony, to support his claim that Cute Togs owed him vacation pay for the year 1983. There is no evidence in the record, oral or written, of any specific policy of Cute Togs regarding vacation pay. The testimony that was elicited from three longtime employees of Cute Togs was that under McGill's management, the company had no vacation pay policy, but that under the management of the previous owners, employees would be paid for a vacation period whether or not they actually worked during their vacation period. Gerd further failed to establish the existence of any agreement between himself and McGill regarding vacation pay. The claim for vacation pay due for 1983 is without merit.

As plaintiff has failed to show that Cute Togs is liable to him for damages, his claim that the assets of the other defendants, McGill, Normac, and McGill Co., are mingled and that Cute Togs corporate veil should be pierced, is moot. Because plaintiff has not proven entitlement to relief against the main defendant, he cannot recover against the other defendants and therefore his suit against McGill, Normac and McGill Co. should be dismissed, as well as his claim for attorney's fees.

### THIRD–PARTY DEMAND AGAINST THE SELLERS

■ Defendant McGill's third-party demand against Henry Oppenheim and Fred Jellin is premised on his argument that they made an inaccurate representation in the stock purchase agreement and by virtue of the agreement, they must hold him harmless. The Court finds that the omission of Cute Togs' debt to Gerd in the agreement is not an inaccurate representation. McGill himself told the sellers and Dudley Yoedicke that he had effectively discharged that debt via a separate agreement. The sellers, the company's attorney, and the obligee all informed McGill of the existence of the $50,000 debt prior to Normac's purchase of the company. While it is unfortunate that this litigation arose, it

is perhaps the result of the failure of all parties to memorialize the transactions in writing. This failure is as attributable to McGill as to the other parties, as he did not choose to include his agreement with Gerd in the written Stock Purchase Agreement. That failure is not due to an inaccurate representation by Henry Oppenheim and Fred Jellin, and therefore, the defendant's third-party demand for indemnification should be dismissed.

## THIRD–PARTY DEFENDANTS' COUNTERCLAIM AGAINST McGILL

The third-party defendants failed to introduce any evidence regarding their tort claim for mental anguish against McGill. As it is patently unmeritorious, the Court finds that the third-party defendants' counterclaim against defendant McGill should also be dismissed.